FOSLER LAW GROUP, INC.
JAMES E. FOSLER
737 West 5th Avenue, Suite 205
Anchorage, AK 99501
Telephone: 907/277-1557
907/277-1657 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

BPXA LAW DEPT

OCT 5 2006

COPY _____
FILE _____

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| UNITE HERE NATIONAL RETIREMENT FUND and JEFFREY PICKETT, Derivatively on Behalf of BP P.L.C., BP AMERICA, INC., BP OIL CO. INC. and BP EXPLORATION (ALASKA) INC., <br><br> Plaintiffs, <br><br> vs. <br><br> THE LORD JOHN BROWNE OF MADINGLEY, IAN M.G. PROSSER, PETER D. SUTHERLAND, BYRON E. GROTE, ANTHONY B. HAYWARD, JOHN A. MANZONI, DAVID C. ALLEN, IAIN C. CONN, JOHN H. BRYAN, ERROLL B. DAVIS, JR., WALTER E. MASSEY, H. MICHAEL P. MILES, MICHAEL H. WILSON, DEANNE S. JULIUS, THOMAS F.W. McKILLOP, ANTONY BURGMANS, DOUGLAS J. FLINT, WILLIAM M. CASTELL, ROBERT A. MALONE, ROSS J. PILLARI, STEPHEN MARSHALL, DEBRA A. PLUMB, DEBRA A. DOWLING, IAN SPRINGETT, DANIEL B. PINKERT, NEIL R. McCLEARY, PAULA J. CLAYTON, | Case No. 3AN-06-_____ Civil <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY AND CORPORATE WASTE** |

[Caption continued on following page.]

ALASTAIR M. GRAHAM, CHRIS J. )
PHILLIPS, STANLEY P. PRESLEY, ROBIN B )
NICHOLSON, CHARLES F. KNIGHT, )
FLORIS A. MALJERS, RICHARD L. OLVER, )
RODNEY F. CHASE, JOHN G.S. )
BUCHANAN, RICHARD C. WOOLLAM and )
WILLIAM DOUGLAS FORD, )
)
                       Defendants, )
)
   – and – )
)
BP P.L.C., BP AMERICA, INC., BP OIL CO. )
INC. and BP EXPLORATION (ALASKA) INC.,)
)
            Nominal Defendants. )
)
_____)

"The [BP] documents showcase the genesis of a corporate scandal that parallels the financial machinations that brought down Enron Corp."

*Truthout Report*, 8/11/06

## INTRODUCTION

1.     This is a stockholder derivative action on behalf of BP P.l.c. against the entire BP P.l.c. Board of Directors (the "Board") and several of its present or former officers and directors for intentional, reckless and/or negligent breaches of their fiduciary duties of care and candor arising out of their causing BP P.l.c. and three of its U.S. subsidiaries – BP America, Inc. ("BP America"), BP Oil Co. Inc. ("BP Oil") and BP Exploration (Alaska) Inc. ("BPX" or "BPXA") (along with BP P.l.c. sometimes collectively referred to as "BP" or the "Company") – to violate the laws of the United States and several of its states relating to environmental regulation and protection, worker and workplace safety and fair and honest trade practices. This intentional, reckless or negligent conduct has caused, and is continuing to cause, BP substantial damage from numerous expensive to defend, and costly to settle, lawsuits, the costs of responding to and the substantial fines and penalties involved in resolving civil and criminal investigations and enforcement proceedings, increased operating costs due to burdensome requirements and restrictions imposed by regulators, and lost revenues and profits due to operational shutdowns or curtailments, as well as serious harm to BP's business reputation and goodwill, due to the adverse publicity resulting from these events.

2.     Nominal defendant BP is a huge international company. It is the largest non-U.S.-based company listed on the New York Stock Exchange. BP is the largest oil and gas

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY      1 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-2    Filed 10/24/06    Page 3 of 32

producer in the U.S. In 1969, BP made a major oil discovery at Prudhoe Bay on Alaska's North Slope, and became part owner and sole operator of the biggest oilfield in the U.S. The Company operates approximately 10,000 miles of pipelines making it the second largest liquids pipeline company in the U.S. BP is also the second largest refiner in the U.S., the second largest fuels marketer and the second largest gasoline marketer, employing 34,000 people here with offices in Alaska and across the 50 states.

3. BP has more operations in the U.S. than in any other country and very substantial operations here in Alaska. Included within BP's operations are crude oil exploration and production, storage facilities, pipelines, refineries and dealings in refined petroleum products (including gasoline and propane). In years past, large international oil companies like BP came under substantial criticism from environmentalists, worker protection groups, consumer advocates and regulators, for the manner in which they conducted business. So, in an effort to differentiate BP from the other big oil companies and secure and/or hold onto their positions of power, prestige and profit with BP, defendants undertook a massive shareholder communications and public relations campaign to present BP, under their stewardship, as an exceptionally progressive, highly ethical and environmentally sensitive corporation, which stressed safety in its operations for the protection of its workers, communities, areas and people impacted by its operations and which was nevertheless achieving very substantial profits due to the skills of its top managers, operating under the oversight of BP's Board of Directors. As a result, these top managers and directors of BP held onto, and enjoyed, their prestigious and highly lucrative

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 4 of 32

BP positions, benefiting from the very considerable perquisites of their offices as directors and officers of one of the world's largest corporations.

4. However, the true facts were quite different than these corporate fiduciaries presented to BP's owners – its shareholders. Faced with aging production and refining facilities, declining easily recoverable reserves at the giant Prudhoe Bay field in northern Alaska and intense competition in its key markets, defendants were resorting to, or encouraging and/or permitting BP's managers to resort to imprudent, improper and even illegal activities to cut costs, boost revenues and temporarily boost BP's reported results from operations. This included, especially in North America, refusing to make, or curtailing, expenditures for necessary plant and equipment maintenance and replacement, skimping on required inspection, maintenance and renewal expenditures for its refineries and pipelines, including those for its facilities at the Prudhoe Bay oil field and engaging in unfair and illegal trade practices, by manipulating the prices of propane, unleaded gas and crude oil. These imprudent and even illegal actions had the desired effect, *i.e.*, cutting BP's costs, while increasing its revenues and boosting its apparent profitability – in the short-term. Given the fact that defendants have limited tenures in their positions at BP, this was their real concern, not BP's long-term profitability or the long-term interests of the actual owners of BP, *i.e.*, its public shareholders. However, defendants' imprudent and even unlawful actions had an inevitable damaging impact, and a very negative one indeed, for BP's long-term future and that of its shareholder community. Despite repeated warnings and "red flags" regarding the dangers of their reckless, imprudent and illegal conduct, defendants refused to stop such conduct or take actions they knew were necessary to correct or remedy the

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY
Pickett v. Madingley, et al., 3AN-06-_____Civil

dangerous conditions created by that conduct. The damaging consequences of defendants'

misconduct have manifested themselves repeatedly in recent years:

- BP has consistently suffered major operating problems at the Prudhoe Bay oil field, including the largest crude oil leak in the history of that field earlier this year, due to defective pipeline maintenance, curtailed inspection programs and inadequate worker training procedures and emergency response plans and procedures. This has resulted in numerous fines and penalties, an unusually high number of employee injuries, a significant curtailment of field production, employee dissatisfaction and moral problems, civil and criminal investigations, governmental directives forcing increased pipeline inspection and maintenance activities and a horrible public relations black eye for BP.

- BP has suffered an unusually – and unacceptably – large number of accidents and worker injuries at BP's Texas City, Texas refinery, culminating in a huge 2005 explosion. The explosion caused over 15 deaths and over 170 injuries and shut down the plant. The explosion resulted from the failure to properly maintain the plant, the use of outmoded and ill-maintained equipment and inadequate training of workers. The explosion has resulted in a rash of civil lawsuits, governmental investigations and the largest U.S. Occupational Safety and Health Administration ("OSHA") fine in U.S. history due to BP's egregious and willful safety violations and a horrible public relations black eye for BP, exacerbated by revelations that similar failures and operating deficiencies plague other BP refineries here in the U.S.

- BP has been targeted by widespread government accusations of and investigations into illegal price manipulation and fixing in the propane market (to which a BP employee has pled guilty), the crude oil over-the-counter market and the market for unleaded gasoline, which investigations burden the Company with substantial costs and the inconvenience of dealing with the existing investigations and expose it to the substantial threat of criminal indictment and fines and penalties, creating unfavorable public relations and a black eye for BP.

5. Defendants' grossly negligent – if not intentional – failure to oversee the

corporate assets of this valuable enterprise have exposed BP to tens of millions of dollars in

damages, potentially hundreds of millions of dollars in remedial costs and badly damaged

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                4 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 6 of 32

BP's corporate image and reputation. Not surprisingly, during recent years BP's ordinary shares have significantly underperformed the stock of its peers in the oil and gas industry:



**BP vs. Peer Group Index**
January 4, 2000 - September 28, 2006

Peer Group = (CVX, COP, AQ FP, XOM, GAZP RU, RDSA LN, RDSB LN, FP FP)

6.     The recent Prudhoe Bay oil field fiasco has come to epitomize BP's safety and environmental failures and violations in the U.S. According to the *"Truthout Report"* published on 8/11/06:

> *Hundreds of pages of documents highlighting BP's nearly decade-long neglect of its Prudhoe Bay pipelines, its internal safety regulations, and the company's alleged cover-up of past oil spills that resulted from severely corroded pipelines are archived on a little known web site maintained by a former oil industry analyst who also acts as a spokesman for BP whistleblowers.*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          5 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 7 of 32

*The documents showcase the genesis of a corporate scandal that parallels the financial machinations that brought down Enron Corp.*

*The BP documents, which include emails, photographs, videos, and letters sent to BP executives . . . as well as internal reports, all of which were early warnings about problems plaguing BP's Prudhoe Bay operations, were written by more than 100 company whistleblowers and date back as far as 1999.*

*The documents are extraordinary in that they provide a detailed picture of how BP seemingly ignored dozens of early warnings from employees that its drilling operations on Alaska's North Slope would be doomed if the company did not take immediate steps to upgrade its pipelines and other infrastructure.*

*   *   *

The web site housing the smoking-gun emails, letters and reports, ANWRnews.com was launched by Chuck Hamel, an activist and former oil broker and analyst based in Alexandria, Virginia. *Hamel was contacted five years ago by a group of BP employees who were concerned that the company's massive cost-cutting measures at its Prudhoe Bay operations would have an adverse impact on safety and operations.*

*   *   *

Hamel, who is credited with exposing weak pollution laws at the Valdez tanker port in the 1980s and electrical and maintenance problems with the trans-Alaska oil pipeline, immediately took up the BP whistleblowers' cause and in mid-2001 wrote a letter to BP president Lord John Browne raising the issue of safety and maintenance problems at the Prudhoe Bay facilities.

*   *   *

*Additional whistleblowers came forward to expose the flaws at BP's North Slope operations, in some cases warning company executives and lawmakers that an Exxon Valdez-type disaster was bound to happen if BP did not invest additional funds in upgrading its corroded pipelines and non-operational safety valves.*

*"The situation will continue to deteriorate for the workers' safety and the environment until one of two things happen: Either there will be a major environmental catastrophe at Prudhoe Bay, similar to the Exxon*

*Valdez, or there will be a change in environmental and employee safety oversight in Alaska before that disaster occurs*," according to a March 4, 2002, copy of BP employee William Burkett's testimony before a Senate Committee chaired by Sen. Joseph Lieberman (D-Conn) and Sen. Bob Graham (D-Fla).

**BP refused to budge, and on several occasions, Hamel alleges, company executives lied to Congress and Alaska state regulators about the condition of its Prudhoe Bay facilities and the amount of money the company was spending on maintenance and pipeline upgrades.**

Indeed, earlier this year, Glen Plumlee, a senor financial analyst with Alyeska Pipeline Service Co., operator of the trans-Alaska pipeline system of which BP is a majority owner, filed a complaint with federal labor officials alleging that company executives retaliated against him because he cooperated with the Environmental Protection Agency's criminal investigation into the company.

Plumlee, 51, of Anchorage, *told federal investigators he was pressured to boost estimates of how much Alyeska was spending to fight corrosion on the trans-Alaska oil pipeline.* Severe corrosion in one of BP's transit pipelines at Prudhoe Bay, which connects directly to the trans-Alaska pipeline, is the reason the company shut down its North Slope operations this week.

\*     \*     \*

Plumlee claims that company executives pressured him in December 2005 to alter the amount of money BP-controlled Alyeska spent on pipeline corrosion – from $28 million to $46 million – for the previous year, which he refused to do.

\*     \*     \*

Another high-level executive of BP-controlled Alyeska also tried to warn company executives about numerous safety and maintenance problems associated with the 800-mile trans-Alaska pipeline system that, if continued to go unanswered, would have a direct impact on BP's Prudhoe Bay operations.

Last August, Dan Hisey, the former chief operating officer of Alyeska, created a comprehensive list for Alyeska's top executives of the 101 current and potential problems plaguing the pipeline system, one of which was severe corrosion. *A week after the list was circulated, Hisey's position was abolished.*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          7 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 9 of 32

*    *    *

*Over the past five years, with profits from drilling declining as the volume of oil extracted from the North Slope fell from 800,000 barrels per day to half that, BP began instituting cost-cutting measures. Hundreds of employees were laid off, and as a result, Hamel claims, safety and maintenance of pipelines and other infrastructures at Prudhoe Bay suffered.*

In an interview with the *New York Times* published March 18, longtime BP employee *Marc Kovac said he and his co-workers warned BP on numerous occasions that cost-cutting measures affecting routine maintenance and inspection would greatly increase the likelihood of accidents, pipeline ruptures and splits.*

*"For years we've been warning the company about cutting back on maintenance,"* Kovac told the *New York Times. "We know that this could have been prevented."*

7.    BP officials have admitted this disaster was due to gross neglect and failure to react to many warnings. According to MSNBC.com:

**BP admits knowledge of corrosion problems**

*    *    *

*BP now admits that senior company official were warned three years ago about serious corrosion problems in the pipeline being shut down this week.*

*The warnings were laid out in correspondence obtained by NBC News, between Chuck Hamel, an advocate for oil workers, and senior BP officials.*

Hamel writes that BP workers had come to him predicting a *"major catastrophic event"* and warning that *"cost-cutting"* had caused *"serious corrosion damage to flow lines and systems."*

*"They were cheating in what's required of them in normal business practice in an oil field to save money, to cut corners,"* Hamel says.

8.    According to *The Wall Street Journal*:

**Congress to Begin Exploration Of BP's Alaska Oil Problems**

SHALEHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY    8 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 10 of 32

The swirl of controversy marks a major setback for Lord Browne, who crafted for BP an image based on environmental and corporate responsibility. While many environmentalists and activist investors have been satisfied that BP matched actions with words, BP is now at risk of losing that goodwill after more than a year of safety, environmental and compliance problems in the U.S.

"I think some of the sort of emotional capital that [BP] has built up will be called in" amid the public scrutiny, said John Elkington, founder of SustainAbility Ltd., a corporate-responsibility consulting firm in London.

Lord Browne isn't expected to testify in hearings scheduled for today or at a Senate hearing on Prudhoe Bay scheduled next week before the Senate Energy and Natural Resources Committee. Instead, Mr. Malone, a native Texan and newly appointed chief executive of BP's American operations, will be the senior executive answering questions from lawmakers.

In March 2005, an explosion at BP's refinery in Texas City, Texas, killed 15 workers. The company was fined heavily for safety shortcomings stemming from the accident. Regulators are still poring over details of the accident, including whether senior BP executives bear more responsibility for safety shortcomings than the company has so far acknowledged.

Meanwhile, the Commodity Futures Trading Commission and Justice Department allege that the company manipulated the U.S. propane market in early 2004, a charge the company denies. Investigators are also probing the company's crude-oil and gasoline-market trading activities. BP has said it is cooperating with investigators but declined to comment further.

9.       The 3/23/05 explosion and fire at BP's Texas City refinery was unprecedented.

It killed 15 workers and injured approximately 170 people. OSHA issued citations alleging

more than 300 violations of 13 different OSHA standards, finding "*Egregious Willful*

*Violations*," "*Willful Safety Violations*" and "*Serious Safety Violations*" which BP agreed

not to contest, paying a $21.3 million penalty – the largest OSHA fine in history. A criminal

investigation is ongoing. But the BP safety problems are not isolated or confined to Texas

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          9 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-2    Filed 10/24/06    Page 11 of 32

City. On 4/24/06, OSHA issued two new OSHA citations to the BP Products' Toledo, Ohio refinery, fined BP, put it in the Enhanced Enforcement Program and issued a release stating:

> "It is extremely disappointing that BP Products failed to learn from the lessons of Texas City to assure their workers' safety and health," OSHA Administrator Edwin Foulke, Jr. said. "Our Enhanced Enforcement Program (EEP) exists for companies like this who, *despite our enforcement and outreach efforts, ignore their obligations under the law and continually place their employees at risk*."

10.   According to the *Financial Times*:

> In late 2004, Don Parus, site manager at BP's biggest refinery, realized something was terribly wrong.
>
> The site had suffered 22 fatalities over 30 years, its safety business plan for 2005 noted there was a key risk of the death of a worker in 12-18 months, and a BP safety presentation opened with the words: *"Texas City is not a safe place to work."*
>
> He commissioned a safety audit by the Telos Group, a Texas-based consultancy, which surveyed more than 1,100 employees, roughly 60 percent of the current workforce, and interviewed over 100.
>
> The 338-page report, a copy of which has been obtained by the *Financial Times*, reveals a safety culture that made many fear working in the facility.
>
> *"The history of investment neglect, coupled with the BP culture of lack of leadership accountability from frequent management changes, is setting BP Texas City up for a series of catastrophic events,"* is just one comment in the audit.
>
> The report was finalized on January 21, 2005. Two months later, the accident predicted by several in the audit arrived: an explosion . . . .
>
> *      *      *
>
> [A]n investigation of the accident by the US Chemical Safety and Hazard Investigation Board (CSB), an independent federal agency that investigates industrial chemical accidents, *revealed BP decided against upgrading equipment that might have prevented the accident; operated with malfunctioning equipment; and had worked staff 30 days straight in 12-*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                                    10 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 12 of 32

*hour shifts, before the accident. It questioned the training and experience of key staff.*

*     *     *

*[I]n the Telos audit, staff surveyed rated "making money" BP's number one priority and "people" its last, at nine.*

11.    According to *The Houston Chronicle*:

**BP LEADS NATION IN REFINERY FATALITIES;**

**Records show big gap between company and top U.S.-based peer**

BP leads the U.S. refining industry in deaths over the last decade, with 22 fatalities since 1995 – more than a quarter of those killed in refineries nationwide, a *Houston Chronicle* analysis shows.

*     *     *

*More than 10 times as many people have died in BP refineries as in those owned by Exxon Mobil Corp., considered the company's major U.S.-based peer.*

*     *     *

[I]n the weeks prior to the Texas City blast, *the oil giant's dismal record landed BP on an internal Occupational Safety & Health Administration watch list of companies for being "indifferent"* to its legal obligations to protect employee safety because of a fatal explosion in Texas City in September 2004 that killed two pipefitters and injured a third.

OSHA accused BP of a "willful" violation of its rules that led to the accident.

OSHA's Enhanced Enforcement program *"zeroes in on employers with the gravest violations who have failed to take their safety and health responsibilities seriously,"* Jonathan Snare, acting assistant secretary of labor for Occupational Safety and Health, said in a recent speech.

*BP is the only major oil company on that list,* said John Miles, OSHA's regional director

*     *     *

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY      11 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-2    Filed 10/24/06    Page 13 of 32

The Texas City explosion was the seventh time a fatal accident had been reported this decade at a BP-owned facility – and the third fatal accident in Texas City.

*     *     *

No other U.S. refining company reported as many death during the decade, according to a *Chronicle* analysis of 80 deaths described in newspaper reports, lawsuits, interviews with major oil companies, and government an industry statistics.

12. BP is also under investigation for manipulating and fixing propane and crude oil prices. The Commodity Futures Trading Commission ("CFTC") has sued BP for the propane price manipulation, alleging it participated in a **"*conspiracy*"** to enrich BP by "inflating the price of propane" carried out with the **"*knowledge, advice and consent of senior management*."** A BP employee has pled guilty and stated the scheme was approved by senior managers. A Department of Justice ("DOJ") criminal investigation of BP continues. BP has also been sued for manipulating the price of crude oil on the New York Mercantile – and the DOJ is investigating this as well.

13. In an effort to present themselves as progressive, socially conscious individuals, who were highly competent stewards and managers of BP's business, the defendants have repeatedly misrepresented how they were overseeing, managing and operating BP. They told the true owners of BP – the shareholders – that:

- "A particularly important task of the board is to monitor the way the company manages its approach to opportunities and risk, which may be operational, financial, environmental or ethical. This monitoring includes an annual review of the full range of possible risks, a review that shapes our continuing assessments. *The board's committees review the business throughout the year*."

- "Our role as a board . . . focuses on ensuring your interests are promoted and that our business maximizes *long-term value for you, our owners. . . .* We also monitor the operations of the business . . . to ensure both that BP's activities live out the values we set and also, critically, that shareholder value lies at the heart of all we do."

- "The board . . . works to ensure that your *long-term* interests as owners are both protected and enhanced. *Our work includes assessing the opportunities and risk confronting the group and monitoring the controls applied to manage and exploit them.* In its oversight of the group, the board recognizes the need for the executive team to exercise its judgment in the management of the business, displaying innovation and entrepreneurship – the qualities that have led BP to its current position – *but without compromising our standards of probity and transparency.*"

- "The way we work is guided by values – *integrity, honest dealing, treating everyone* with respect and dignity, striving for mutual advantage, transparency and contributing to human progress. These values are enshrined in practical policies and standards that govern areas of our activity, including health, *safety,* security, *environment, ethical conduct* and business relationships."

- "We use a system of risk management to assess the impact of our activities on the environment, local economies and communities. Where appropriate, accountability for managing *environmental* and social impacts is part of managers' performance contracts, with specific objectives and milestones. *People's safety is of the highest priority. Managers are accountable for ensuring that safety risks are properly addressed, staff are trained and facilities are well maintained. We closely monitor our safety performance.*"

- "*People's safety is of the highest priority. Managers are accountable for ensuring that safety risks are properly addressed, staff are fully trained and facilities are well maintained.* We closely monitor our safety performance. The number of serious injury cases (resulting in our employees or contractors being away from work for a day or more) has dropped from almost 30 per month in 1999 to 21 per month in 2003."

- "In 2004, the number of injury cases (resulting in our employees or contractors being away from work for a day or more) was 0.08 per 200,000 hours worked, compared with 0.09 in 2003. This performance is approaching the best in our industry and also within our target set at 0.09 for 2004."

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          13 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 15 of 32

- "We set the standard of corporate and financial performance on a global scale by delivering on promises that go beyond financials, *including environmental performance, safety* . . . ."

- "[T]he BP family embraces fixed, fundamental qualities that we apply to everything we do. These are our group values and they include *integrity, honesty*, dignity and respect for others and contributing to human progress. *These values cover health and safety; legal and ethical compliance; risk management* . . . ."

- "*Safety is fundamental to the way we conduct our business, as governed by our Guiding Principles*

  - Operations Review Team

  - Safety induction and training

  - Preventative measures

  - Industrial safety standards

  - Performance data"

- "Underpinning these objectives is our drive to ensure that we operate responsibly in all areas of our business. *This means making worker safety and protection of the environment top priorities in business delivery.*"

- "To ensure consistency on a global level, BP requires all of its major installations to develop and maintain an environmental management system (EMS) certified to meet ISO 14001 standards – an international standard that defines the overall structure and requirements of an EMS."

- "The standard is based on compliance with regulations, prevention of pollution and continual improvement. Our compliance assurance process is an integral part of the overall EMS. Its structure is based on the Plan-Do-Check-Act that requires:

  - identification of legal and other requirements

  - determination of structure, responsibility and operational control

  - development of monitoring and measurement, corrective and prevention action

- management review."

- "Legal requirements include applicable laws, regulations, permits, agency orders and enforceable agreements. Other requirements include initiatives set by industry groups and internal corporate agreements. Requirements are entered into a compliance matrix that summarizes applicable requirements for relevant projects, facilities and activities. The matrix is updated and maintained through periodic reviews to reflect new and revised requirements as well as changes in operations."

- "***BPXA is committed to pollution prevention*** and waste minimization. Pollution prevention is a good business practice, reduces environmental risks, increases efficiency, reduces potential environmental liability and saves money. ***Pollution prevention is integrated into our environmental management systems.***"

- "BPXA spends about $50 million annually to monitor, locate, repair and manage the effects of corrosion that occurs when an electrochemical process breaks down steel. On Alaska's North Slope, we operate thousands of steel vessels and most of the 1,600-plus miles of pipelines that carry oil, water and gas from wellsites through processing facilities and ultimately to sales or injection points. ***We semi-annually review our corrosion plan with the state Department of Environmental Conservation. Under the plan, corrosion managers direct corrosion mitigation resources to protect and extend the life of the assets.***"

- ***Internal corrosion rates have declined 90% since 1992. . . . The external corrosion program was substantially increased in 2002 from the historical level of more than 13,000 locations per year to about 35,000 locations in 2003.***"

14. Unfortunately, BP has become one of the U.S.'s largest polluters and environmental law violators, operator of unsafe work facilities and fixer/manipulator of the prices of oil and propane products. Defendants' conduct – cutting back on prudent and necessary expenditures to comply with environmental and worker safety laws and regulations and fixing product prices – was done to enrich themselves by boosting BP's

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    15 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 17 of 32

apparent short-term profits, paying themselves grossly excessive compensation and benefits, knowing or recklessly disregarding that their actions hurt BP in the longer term.

15.     Just how serious the current crisis surrounding BP is, is highlighted by hearings just held before a U.S. Congressional committee, as reported by the *Anchorage Daily News*:

**Congress grills BP execs**

**House panel asks if company profit precluded pipeline maintenance**

. . . The first of at least four congressional hearings into why BP failed to prevent pipeline failures on Alaska's North Slope began dramatically Thursday when Richard Woollam, the company's corrosion chief until 2005, refused to testify, citing his right against self-incrimination.

In a day marked with blistering criticism of BP from Republicans and Democrats on the House Energy and Commerce Committee, the British-born Woollam, derided in an internal BP report as "King Richard" for his dictatorial style, declined to answer any questions.

The committee's investigations panel is looking into the failure of BP to monitor and control corrosion on two North Slope transit pipelines that feed the trans-Alaska pipeline.

One of those lines had a catastrophic leak March 2, spilling more than 200,000 gallons of oil in the tundra and the ice-locked shore of an unnamed lake. The other line had a smaller leak in August. Unsure of the reliability of either line, BP announced it would shut down all Prudhoe Bay production Aug. 6, then later limited the closure to the field's eastern half.

Over and over, the committee members grilled BP Exploration Alaska president Steve Marshall, demanding to know why BP neglected to conduct the only reliable test of the decay of an entire pipeline – a "smart pig" that travels inside the pipe and records the thickness of the wall along the pipe's length.

Marshall replied that company officials believed the line wasn't as susceptible to corrosion as others. The last smart pig run on the western line was in 1998; on the eastern line, it was 1992.

But was it just an error in judgment, the committee wanted to know, or was something else at work? Was BP shaving costs to increase profits? Were

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          16 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 18 of 32

executives trying to beef up their annual bonuses by meeting budgets regardless of the consequences? Along those lines, committee chairman Joe Barton, R-Texas, wondered aloud whether BP was "betting the farm" that the Prudhoe Bay field would run out before the pipeline failed, saving the costs of replacing it.

"Shame, shame, shame," he said.

*     *     *

Woollam was a late entry on the witness list. House investigators looking into claims that corrosion workers were afraid to criticize BP's practices unearthed an internal BP report from 2004. That report, by the law firm Vinson & Elkins, said Woollam's "overbearing management style" created a climate "where the fear of retaliation and intimidation could and did occur."

*     *     *

After pleading the Fifth Amendment in the packed committee room, Woollam was quickly dismissed from the hearing. He rushed from the Rayburn Building without speaking to reporters.

The Vinson & Elkins report recommended that Woollam be stripped of his supervisory duties. In January 2005, three months after the report was delivered, BP reassigned him to Houston. Malone said Woollam was recently placed on administrative leave, with pay.

Woollam, and the presence of a battery of defense attorneys, was a sharp reminder of grand jury proceedings in Anchorage hanging over the congressional hearings. The Justice Department and EPA are investigating whether the March 2 oil spill was a criminal violation of the Clean Water Act.

*     *     *

The two transit lines were unregulated by the U.S. Transportation Department's Pipeline and Hazardous Materials Safety Administration because they operated at low pressure in a remote area. Even after the spill, when the agency decided to impose its regulatory authority, BP resisted, said its administrator, Thomas Barrett, testifying in a later panel.

"It's the kind of thing that would cause us to question their commitment," said Rep. John Dingell, D-Mich.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          17 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 19 of 32

Barrett's chief safety officer, Stacy Gerard, said BP had a pattern of resisting regulation. The company fought having its high-pressure lines included in a new integrity management program designed to increase safety, primarily through the use of pigs to clean and test the pipe.

16.     Demand on the directors of BP to bring this lawsuit or vigorously pursue it would be a futile and useless act. To do so, they would have to sue themselves and/or people they have hired and supervised and thus not only expose their own incompetent and/or illegal behavior, but also expose themselves to gigantic uninsured liabilities. This they will not do. Thus, in order for the true facts to be uncovered, discovered and proved and the past harm to BP remedied, with future harm to it ameliorated or prevented, this action must be pursued by the plaintiffs derivatively on behalf of and for the benefit of BP. This action is brought in good faith for the benefit of BP and it is respectfully requested that this Court permit this action to proceed.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Alaska Stats. §§22.10.020, 10.06.435(a), 10.06.740, and common law. Each individual defendant has minimum contacts with Alaska sufficient to justify that state's exercise of personal jurisdiction over each of them, consistent with the laws of Alaska and the United States Constitution.

18.     Defendant BPX is a citizen of Alaska as its principal place of operations is located in Anchorage, Alaska. Certain of the other defendants are residents and citizens of Alaska. Plaintiff Pickett is a citizen and resident of Alaska. There is no diversity of citizenship and this case may not be removed to federal court.

19.     Venue is proper in this County pursuant to Alaska Stat. §22.10.030 and Alaska R. Civ. P. 3, because, among other things, BP does substantial business in Anchorage County, including operating two of its major subsidiaries out of Anchorage, BPX, and BP Pipelines (Alaska) Inc. A very substantial part of the wrongdoing occurred in and/or had effect in Alaska. Much of the evidence to prove plaintiffs' claims – including the location of important physical and documentary evidence and witnesses able to provide live testimony – is here in Alaska. BPX pled guilty in Alaska to one felony count of knowingly violating CERCLA on 9/23/99, subjecting the Company to five years probation in Alaska. BP's federal regulators, the U.S. DOJ, the U.S. EPA and the Alaska Department of Environmental Conservation ("DEC") have all taken extensive regulatory and/or criminal actions against BP in Alaska (which form part of the basis of this suit) and are all currently investigating BP in Alaska.

## THE PARTIES

20.     (a)     Plaintiff UNITE HERE National Retirement Fund is, and was at the time of the commission of the wrongful acts complained of herein, a stockholder of BP. This plaintiff currently owns 6,000 BP ADRs.

(b)     Plaintiff Jeffrey Pickett is, and was at the time of the commission of the wrongful acts complained of herein, a stockholder of BP. Jeffrey Pickett, a long-term individual BP shareholder, is a citizen and resident of Alaska.

21.     Each plaintiff brings this action derivatively in the right of and for the benefit of BP. Each plaintiff will fairly and adequately represent the interests of BP and its shareholders in enforcing the rights of BP.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                19 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 21 of 32

22.     Nominal defendant BP P.l.c. is a U.K. corporation with its formal corporate headquarters in London.  BP described itself as:

>    **The BP Group is one of the three largest integrated energy companies in the world.  Headquartered in London, we have more than 103,000 employees and operations in more than 100 countries on six continents**

\*          \*          \*

>    BP's strategy is to apply the distinctive capabilities possessed by our people in a distinctive portfolio of assets, chiefly oil and gas fields, refineries, service stations and petrochemical plants.   This takes place within a disciplined financial framework, thereby generating highly competitive, but secure returns.

>    Underpinning these objectives is our drive to ensure that we operate responsibly in all areas of our business.  ***This means making worker safety and protection of the environment top priorities in business delivery.***

\*          \*          \*

>    ***We are the largest U.S. oil and gas producer and a major refiner and manufacturer of petrochemicals and specialty chemicals.***

\*          \*          \*

>    ***We are organized so that we can achieve centralized direction . . . . Business units have responsibility for ensuring that operations on the ground are conducted in accordance with our values, principles and policies.***

23.     BP described its business in Alaska as follows:

**Our business in Alaska**

>    **BP Exploration (Alaska) Inc. (BPXA) operates 13 North Slope oil fields, four North Slope pipelines, and owns a significant interest in six other producing fields.  Our 26.35% interest in the Prudhoe Bay natural gas resource is a large undeveloped source of natural gas**

>    •    Alaska provides about 10% of our worldwide oil production

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY
Pickett v. Madingley, et al., 3AN-06-_____Civil                                    20 of 107

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 22 of 32

- we have been a major player in Alaska since 1969 when significant oil was found at Prudhoe Bay, following ten years of preliminary exploration and investment

- we are the operator of Prudhoe Bay, North America's largest oil field, following a realignment of oil and gas ownership interests in 2000

- our activities now center on commercializing known resources rather than exploration

- throughout our activities, we apply stringent environmental, safety, and social standards. Some of our commitments are incorporated within the Charter signed with the State of Alaska in 1999

As an upstream business of BP plc, BPXA is responsible for oil and gas exploration, development and production in Alaska.

BP Pipelines Alaska Inc. provides oversight for our interest in the Trans-Alaska Pipeline System and local North Slope pipelines.

BP Transportation (Alaska) has oversight for BP's shipping and interest as a common carrier for the Trans-Alaska Pipeline. We lease part of our 13-storey [sic] Anchorage headquarters to Alyeska Pipeline Service Company, the company that operates the Trans-Alaska Pipeline.

## Standards of safety

For BPXA and our contractors, safety takes priority in all operations. We have taken important steps since 2001 to act on the concerns of some of our staff about issues of operational integrity. Our framework for ensuring safety in all of our activities is described in "Our business performance".

## Our business performance

## Exploration, production and transportation:  Highlights

From our long-standing commitment to Alaska and our significant investment there for over 40 years, we are one of the major oil and gas producers in the state. We have historically been Alaska's largest investor and taxpayer. Examples of our investments in Alaska are highlighted below:

- we operate 13 North Slope oil fields, including Prudhoe Bay, with daily gross production of approximately 720,000 barrels of oil equivalent

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          21 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 23 of 32

- we have a 26.35% interest in the North Slope's recoverable natural gas resource – some 35 trillion cubic fee

- 2003 BP Alaska net production was 12% higher than 2001, due to production from the Northstar field and the performance of satellite fields around the mature Prudhoe Bay and Kuparuk fields

- BP Pipelines owns about 47% of the 800-mile Trans-Alaska Pipeline System

24.     BP is incorporated under English law, which permits or will permit this action to be maintained based on the allegations made in this Complaint. However, due to BP's extensive U.S. and Alaskan operations, the large number of BP shareholders in the U.S., the locus of the wrongdoing, and the interests of the U.S. and Alaska impacted by that conduct under the local law exception to the internal affairs clause, the laws of Alaska or another appropriate U.S. jurisdiction may be applied to permit this action to be maintained. BP's ties to – and impact on – the U.S. is highlighted by the following:

- 39% of BP's worldwide shareholders reside in the U.S.

- BP has approximately 34,000 employees in the U.S., one-third of its total worldwide employees and more than in any other country.

- BP produces more crude oil in the U.S. than in any other country.

- BP produces more natural gas in the U.S. than in any other country.

- BP's capital expenditures in the U.S. are larger than in any other country and BP has more operating capital employed in the U.S. than in any other country.

25.     Nominal defendant BP America, Inc. ("BP America") is a Delaware corporation headquartered in London, Illinois and a direct subsidiary of nominal party BP P.l.c.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    22 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 24 of 32

26.     Nominal defendant BP Oil Co. Inc. ("BP Oil") is located at 4101 Winfield Rd, London, Illinois and a direct subsidiary of BP America.

27.     Nominal defendant BP Exploration (Alaska) Inc. ("BPX" or "BPXA") is a Delaware corporation with its principal place of business in Anchorage, Alaska, and a direct subsidiary of BP Oil.  BPX is Alaska's sixth-largest employer with 1,320 employees in 2003, and an annual payroll of $204.2 million.  According to BP, BPX was committed to safety in its operations:

> **Safety and operational integrity**
>
> As part of the BP group, BP Exploration (Alaska) Inc. (BPXA) is guided by corporate health, safety, security and environmental (HSSE) policies. . . .
>
> Consistent with our global policies, BP in Alaska maintains an HSSE management system framework that is consistently applied to all BP businesses throughout the world.  The framework includes expectations for the management of
>
> • safety and accident prevention
>
> • plant and equipment integrity
>
> • pollution prevention
>
> *          *          *
>
> The management of every business unit translates these expectations into performance targets.  Each business in the Group must demonstrate continuing progress toward these targets through an HSSE assurance process that involves audits, reports and dialogue within the company.
>
> Accordingly, within Alaska, BPX has
>
> *          *          *

SHADEHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          23 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 25 of 32

- ***taken meaningful steps to prevent spills*** and has responded promptly and effectively when spills have occurred at the company's North Slope oil fields

\*     \*     \*

*[S]afety takes priority in all operations.* Our lost time accident rate on the North Slope has remained well below the average for all of US industry . . . .

As the Occupational Safety and Health Administration (OSHA) publishes injury data by industry and state, it is possible to put BPXA's safety performance in context. ***The data shows that sales clerks, food service workers, construction workers, truck drivers, newspaper staff, and others employed elsewhere in Alaska or the US are more likely to suffer a "Day Away From Work Case" (DAFWC) injury than a worker in one of BPXA's North Slope oil fields.***

28.     The corporate entities described above in ¶¶22-27, sometimes collectively referred to herein as "BP," enjoy parent/subsidiary relationships as follows:



29.     The defendants include the entire BP P.l.c. Board of Directors as of the filing of this Complaint, referred to herein sometimes as the "Director Defendants." Along with the Director Defendants, the remainder of the BP officers and directors named below at ¶¶30-67 are referred to herein as the "Individual Defendants."

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    24 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-2    Filed 10/24/06    Page 26 of 32

30. Defendant Peter D. Sutherland ("Sutherland") is the Non-Executive Chairman of the BP Board and has served as a BP director since 1995. Sutherland rejoined BP's board in 1995, having been a non-executive director from 1990 to 1993, and was appointed Chairman in 1997. Sutherland, a barrister admitted to practice before the U.S. Supreme Court, has extensive contacts with the U.S. Sutherland also serves as the non-executive chairman of Goldman Sachs International and defendant The Lord John Browne serves as a director of the Goldman Sachs Group Inc., which is based in the U.S.

31. Defendant The Lord John Browne of Madingley ("Browne") has served as BP's Group Chief Executive Officer since 1995 and as an executive director since 1991. Browne has extensive contacts with the U.S. and visited Prudhoe Bay as recently as early 8/06. Browne joined BP in 1966 and subsequently held a variety of exploration and production and finance posts in the U.S., U.K. and Canada. Browne serves as a director of Intel Corporation in California and of the Goldman Sachs Group Inc. in New York City. Browne's 2005 compensation package, worth over $5.8 million, consisted of a salary of $2.6 million and a bonus of $3.1 million.

32. Defendant Ian M.G. Prosser ("Prosser") has served as Non-Executive Deputy Chairman of the BP Board since 1999 and as a director since 1997. Prosser has extensive contacts with the U.S., including serving as a director of the Sara Lee Corporation.

33. Defendant Byron E. Grote ("Grote") has served as BP's Chief Financial Officer ("CFO") since 2002 and as a director since 2000. Grote is a U.S. citizen and has extensive contacts with the U.S., having joined BP in 1987 following the acquisition of The Standard Oil Company of Ohio, where he had worked since 1979. Grote became BP's

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          25 of 107
Pickett v. Madingley, et al., 3AN-06-:_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 27 of 32

Treasurer in 1992 and in 1994 Regional Chief Executive for Latin America. Grote's 2005 compensation package, worth over $2.0 million, consisted of a salary of $923,000 and a bonus of $1.1 million.

34.     Defendant Anthony B. Hayward ("Hayward") has served as a BP's Chief Executive of Exploration and Production ("E&P") since 2003 and as a director since 2003. As the head of BP's E&P division, Hayward has extensive contacts with the U.S. due to his oversight of BP's U.S. operations. Hayward's 2005 compensation package, worth over $1.6 million, consisted of a salary of $784,420 and a bonus of $837,200.

35.     Defendant John A. Manzoni ("Manzoni") has served as BP's Chief Executive of Refining and Marketing since 2003 and as a director since 2003, having joined BP in 1983. Manzoni has extensive contacts with the U.S. having served as BP's Regional President for the eastern U.S. in 2000 and Executive Vice President and Chief Executive for BP's gas and power segment in 2001. Manzoni's 2005 compensation package, worth $1.5 million, consisted of a salary of $784,420 and a bonus of $800,800.

36.     Defendant David C. Allen ("Allen") has served as BP's Group Chief of Staff since 2003 and as a director since 2003. Allen has extensive U.S. contacts having joined BP in 1978 and subsequently undertaking a number of corporate and E&P roles in New York. Allen also serves as chairman of BP Pension Trustees Ltd., which oversees the pensions of BP workers in the U.S. Allen's 2005 compensation package, worth over $1.6 million, consisted of a salary of $784,420 and a bonus of $873,600.

37.     Defendant Iain C. Conn ("Conn") has served as a BP's Group Executive Officer, Strategic Resources since 2004 and as a director since 2004, having joined BP in

1986. Conn has extensive contacts with the U.S. having served as the Group Vice President of BP's refining and marketing business in 2000 and Chief Executive of Petrochemicals from 2002 to 2004. Conn also serves as Chairman of BP Pension Trustees Ltd., which oversees the pension of BP workers in the U.S. Conn's 2005 compensation package, worth over $1.5 million, consisted of a salary of $766,220 and a bonus of $819,000.

38.     Defendant John H. Bryan ("Bryan") has served as a Non-Executive Director of BP since 1998 when BP acquired Amoco where Bryan served as a director. Bryan is a U.S. citizen and has extensive contacts with the U.S.

39.     Defendant Erroll B. Davis, Jr. ("Davis") has served as a Non-Executive Director of BP since 1998 when BP acquired Amoco where Davis served as a director. Davis is a U.S. citizen and has extensive contacts with the U.S.

40.     Defendant Walter E. Massey ("Massey") has served as a Non-Executive Director of BP since 1998 when BP acquired Amoco where Massey served as a director. Massey is a U.S. citizen and has extensive contacts with the U.S.

41.     Defendant DeAnne S. Julius ("Julius") has served as a Non-Executive Director of BP since 2001. Julius has extensive U.S. contacts, having begun her career as a project economist with the World Bank in Washington.

42.     Defendant Thomas F.W. McKillop ("McKillop") has served as a Non-Executive Director of BP since 2004. He has extensive contacts with the U.S.

43.     Defendant Antony Burgmans ("Burgmans") has served as a Non-Executive Director of BP since 2004. He has extensive contacts with the U.S.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    27 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 29 of 32

44.    Defendant Douglas J. Flint ("Flint") has served as a Non-Executive Director of BP since 2005. He has extensive contacts with the U.S.

45.    Defendant William M. Castell ("Castell") has served as a Non-Executive Director of BP since July 2006. He has extensive contacts with the U.S.

46.    Defendant H. Michael P. Miles ("Miles") served as a Non-Executive Director of BP from 1994 until April 2006. As a Director of BP Pension Trustees Ltd. Miles oversaw the pension benefits of thousands of U.S. workers. He has extensive contacts with the U.S.

47.    Defendant Michael H. Wilson ("M. Wilson") served as a Non-Executive Director of BP from 1998 until he resigned in February 2006. Wilson has extensive U.S. contacts, having previously been a director of Amoco prior to the BP merger.

48.    Defendant Robin B. Nicholson ("Nicholson") served as a Non-Executive Director of BP from 1987-2005. Nicholson has extensive contacts with the U.S.

49.    Defendant Charles F. Knight ("Knight") served as a Non-Executive Director of BP from 1987-2005. Knight has extensive U.S. contacts having served as Chairman of Emerson Electric and as a Non-Executive Director of Anheuser-Busch, Morgan Stanley, IBM and SBC Communications.

50.    Defendant Floris A. Maljers ("Maljers") served as a Non-Executive Director of BP from 1998-2004. Maljers has extensive U.S. contacts, having previously served as a Non-Executive Director of Amoco from 1994-1998.

51.    Defendant Richard L. Olver ("Olver") served as BP's Deputy CEO from 2003 to July 2004 and as a BP Executive Director from 1998 to July 2004. Olver has extensive U.S. contacts.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          28 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 30 of 32

52.     Defendant Rodney F. Chase ("Chase") served as BP's Deputy CEO and an Executive Director of BP from 1992-2003. Chase has extensive U.S. contacts having also served as a Non-Executive Director of Computer Sciences Corporation.

53.     Defendant John G.S. Buchanan ("Buchanan") served as BP's CFO and an Executive Director of BP from 1996 to 11/02. Buchanan has extensive U.S. contacts.

54.     Defendant William Douglas Ford ("Ford") served as CEO of BP's Refining and Marketing division and as an Executive Director of BP from 2000-2002, having previously served as an executive of Amoco. Ford is a U.S. citizen.

55.     Defendant Robert A. Malone ("Malone") has served as Chairman and President of BP America since 2006. He has extensive contacts with the U.S. Prior to his recent appointment, Malone had extensive contacts with the U.S., heading up BP's shipping arm. Prior to accepting his current position, Malone held senior positions within Kennecott Copper Corporation and the Standard Oil Company of Ohio (Ohio), as well as at BP, where he was president, CEO, and Chief Operating Officer of Alyeska Pipeline Service Company, operator of the Trans Alaska Oil Pipeline.

56.     Defendant Ross J. Pillari ("Pillari") served as the President of BP America until 6/06. Pillari is a U.S. citizen, resides in Illinois and has extensive U.S. contacts having joined Standard Oil of Ohio in 1972, which was acquired by BP in 1987. Pillari returned from London in 1990 as BP's Vice President of Retail Sales and in June 1996 assumed the dual role of Senior Vice President, Marketing and Oil and a director of BP Oil U.S.A. Following the merger with Amoco and the acquisition of ARCO, Pillari became the Group Vice President for the U.S.A., UK and Continental European retail operations.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY
Pickett v. Madingley, et al., 3AN-06-_____Civil                                   29 of 107

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 31 of 32

57.     Defendant Stephen Marshall ("Marshall") is the President and served as a director of BPX until 1/06. Marshall is a U.S. and Alaskan citizen, living in Alaska. He has extensive contacts with the U.S.

58.     Defendant Debra A. Plumb ("Plumb") is the Secretary and a director of BPX. She is a U.S. and Alaskan citizen, living in Alaska. She has extensive contacts with the U.S.

59.     Defendant Debra A. Dowling ("Dowling") is a director of BPX. She is a U.S. citizen. She has extensive contacts with the U.S.

60.     Defendant Ian Springett ("Springett") is a Vice President of BPX. He is a U.S. and Alaskan citizen, living in Alaska. He has extensive contacts with the U.S.

61.     Defendant Daniel B. Pinkert ("Pinkert") served as a director and Vice President of BPX until at least 1/23/04. He is a U.S. citizen. He has extensive contacts with the U.S.

62.     Defendant Neil R. McCleary ("McCleary") served as a Senior Vice President of BPX until at least 1/22/02. He is a U.S. and Alaskan citizen, living in Alaska. He has extensive contacts with the U.S.

63.     Defendant Paula J. Clayton ("Clayton") served as a Senior Vice President of BPX until at least 1/22/02. He is a U.S. and Alaskan citizen, living in Alaska. He has extensive contacts with the U.S.

64.     Defendant Alastair M. Graham ("Graham") served as a Senior Vice President of BPX until at least 1/22/02. He is a U.S. and Alaskan citizen, living in Alaska. He has extensive contacts with the U.S.

Case 3:06-cv-00239-RRB   Document 5-2   Filed 10/24/06   Page 32 of 32