properly conducted. Later, ***admitting that this representation was false***, BP promised to improve its field monitoring and safety programs. Four months later, a welder repairing a high-pressure line at Prudhoe Bay ***was killed when a plug blew out of the line.***

125.    Then, on 3/23/05, an explosion and fire at BP's Texas City refinery killed 15 workers and injured approximately 170, prompting an onslaught of lawsuits against BP. Company-generated reports admitted poor management and lack of hazard awareness as reasons for the blast. OSHA, the U.S. Chemical Safety and Hazard Investigation Board ("CSB"), the U.S. Environmental Protection Agency and the Texas Commission on Environmental Quality, among other agencies, have conducted or are conducting investigations. At the conclusion of their investigation, OSHA issued citations alleging more than 300 violations of 13 different OSHA standards. BP agreed not to contest the citations. BP settled that matter with OSHA on 9/22/05, paying a $21.3 million penalty and undertaking a number of corrective actions designed to make the refinery safer. OSHA referred the matter to the U.S. DOJ, and the DOJ has opened a criminal investigation.

126.    The safety failures at BP's Texas City refinery were grotesque. On 9/22/05, OSHA issued a release describing BP's ***"Egregious Willful Violations," "Willful Safety Violations"*** and ***"Serious Safety Violations."*** The release was headlined and stating:

**OSHA Fines BP Products North America More Than $21 Million Following Texas City Explosion**

**Company Agrees To Make Extensive Plant-Wide Improvements**

. . . BP Products North America Inc. has agreed to pay more than $21 million in penalties for safety and health violations following an investigation of a fatal explosion at its Texas City, Texas, plant March 23 that claimed the lives of 15 workers and injured more than 170 others. The penalties are part

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    71 of 107
Pickett v. Madingley, et al., 3AN-06-_____ Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 1 of 40

of a settlement agreement announced today by the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA).

*     *     *

"This citation and penalty – *__nearly double the next largest fine in OSHA history__* – sends a strong message to all employers about the need to protect workers and make health and safety a core value," Solicitor of Labor Howard M. Radzely stated. "BP will pay the full fine, abate all the hazards, and significantly improve their safety measures."

*     *     *

**Egregious Willful Violations**

*     *     *

**TOTAL PROPOSED PENALTIES FOR EGREGIOUS WILLFUL VIOLATIONS: $20,720,000.**

Willful violations are those committed with an intentional disregard of, or plain indifference to, the requirements of the Occupational Safety and Health Act and regulations.

**Willful Safety Violations**

*     *     *

**TOTAL PROPOSED PENALTY FOR WILLFUL HEALTH VIOLATIONS: $140,000.**

**Serious Safety Violations**

*     *     *

**TOTAL PROPOSED PENALTY FOR SERIOUS SAFETY ITEMS: $86,500.**

**Serious Health Violations**

*     *     *

**TOTAL PROPOSED PENALTY FOR SERIOUS HEALTH VIOLATIONS: $70,000.**

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY      72 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 2 of 40

**SUMMARY OF PROPOSED PENALTIES:**

| | |
|---|---:|
| EGREGIOUS WILLFUL | $20,720,000 |
| WILLFUL | 490,000 |
| SERIOUS | 156,000 |
| OTHER THAN SERIOUS | 2,000 |
| TOTAL FOR ALL VIOLATIONS: | $21,361,500 |

127.    The BP refinery safety problems are not isolated or confined to Texas City. On 4/24/06, OSHA issued two OSHA citations to the BP Products' Toledo, Ohio refinery. The penalty assessed for both citations was $2.4 million. On 4/25/06, OSHA issued a release stating:

**OSHA Fines BP $2.4 Million for Safety and Health Violations**

**Inspection Initiated under Enhanced Enforcement Program**

. . . The U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) today fined BP Products North America, Inc. more than $2.4 million for unsafe operations at the company's Oregon, Ohio refinery. *OSHA's inspection identified a number of violations similar to those found during an investigation of the fatal explosion at BP's Texas City, Texas, refinery that claimed the lives of 15 workers and injured more than 170 others.*

*"It is extremely disappointing that BP Products failed to learn from the lessons of Texas City to assure their workers' safety and health," said Edwin Foulke, Jr., OSHA assistant secretary. "Our Enhanced Enforcement Program (EEP) exists for companies like this who, despite our enforcement and outreach efforts, ignore their obligations under the law and continually place their employees at risk."*

OSHA's Toledeo Area Office initiated an inspection at the Ohio refinery in response to an alert issued by OSHA under the EEP. The inspection resulted in 32 per-instance willful citations, with penalties of more than $2.2 million. . . .

BP was fined an additional $140,000 for two *willful violations.*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    73 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-4    Filed 10/24/06    Page 3 of 40

128.  BP's worker safety shortcomings are systemic.  According to the *Financial Times*:

> A safety audit of BP's biggest refinery, obtained by the Financial Times, reveals the *UK oil giant deferred maintenance and delayed repairs to the extent that staffers concluded equipment was in a "dangerous condition."*

> The views in that 2005 audit conducted by an independent consultancy echoed those of BP staffers as far away as Alaska, *who have warned for four yeas that staff and the environment were at significant risk, as accidents continued unabated.*

> In the past year, both locations have experienced severe accidents.  The audited refinery in Texas City exploded in 2005, killing 15 people and injuring an estimated 500 in the deadliest refinery accident for more than a decade. . . .

> That BP operations in Texas and Alaska have suffered such significant lapses, amid employee complaints about safety, supports the US Chemical Safety and Hazard Investigation Board, an independent federal agency charged with investigating industrial chemical accidents, in questioning BP's safety culture.

129.  BP's top executives were warned about the serious problems at Texas City.

The *Financial Times* also reported:

> In late 2004, Don Parus, site manager at BP's biggest refinery, realised something was terribly wrong.

> The site had suffered 22 fatalities over 30 years, its safety business plan for 2005 noted there was a key risk of the death of a worker in 12-18 months, and a BP safety presentation opened with the words: *"Texas City is not a safe place to work."*

> He commissioned a safety audit by the Telos Group, a Texas-based consultancy, which surveyed more than 1,100 employees, roughly 60 percent of the current workforce, and interviewed over 100.

> The 338-page report, a copy of which has been obtained by the *Financial Times*, reveals a safety culture that made many fear working in the facility.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                74 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 4 of 40

*"The history of investment neglect, coupled with the BP culture of lack of leadership accountability from frequent management changes, is setting BP Texas City up for a series of catastrophic events,"* is just one comment in the audit.

The report was finalised on January 21, 2005. Two months later, the accident predicted by several in the audit arrived: an explosion killed 15 people and injured an estimated 500 in the deadliest refinery accident in more than a decade. Four months later, the site suffered another explosion.

It is unclear how much BP's leadership knew about site safety. Several in the audit said they were *bullied about accidents so much that many went unreported.* A risk identified in BP's 2005 safety business plan, seen by the FT, was that the site would not report all incidents for *"fear of consequences."*

Ronnie Chappell, BP spokesman, said there had been a "comprehensive effort by Texas City refinery leadership to drive continued safety improvement, encourage the reporting of injuries and near misses and ensure the thorough and complete investigation of injuries and incidents at the refinery."

That said, an investigation of the accident by the US Chemical Safety and Hazard Investigation Board (CSB), an independent federal agency that investigates industrial chemical accidents, *revealed BP decided against upgrading equipment that might have prevented the accident; operated with malfunctioning equipment; and had worked staff 30 days straight in 12-hour shifts, before the accident. It questioned the training and experience of key staff.*

"In a corporation with a good safety culture, near-miss reporting is actively encouraged and corrective steps are put in place before disaster strikes," said Carolyn W. Merritt, chairwoman of the CSB. *"The CSB was concerned enough about what we saw in Texas City to recommend an examination throughout BP North America."*

BP has undertaken that examination and shut the refinery for a $1bn repair programme. The Department of Labor uncovered over 300 violations and settled with BP, which did not admit fault, but agreed to improve processes and pay a maximum $21m fine.

The Department of Labor has referred the case to the Department of Justice to review for "criminal action".

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY       75 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-4    Filed 10/24/06    Page 5 of 40

*"Even if the lapses at the Texas City refinery were an aberration, where was the corporate oversight to bring that facility into line?"* Ms. Merritt asked. "BP needs to make certain that it has effective safety systems, maintenance resources, staffing, and auditing in place to prevent major safety or environmental incidents."

\*     \*     \*

*[I]n the Telos audit, staff surveyed rated "making money" BP's number one priority and "people" its last, at nine.*

"At the refinery, there's a frame of mind like, 'We are the ones that make the money'," said a worker in the audit. "They take pride in running on thin air, but if they do it by killing someone every 18 months, then you don't have bragging rights about production."

William Bradley Bessire, a contract worker, was so severely injured in the explosion he has metal plates in his back, can barely move his neck, and is in constant pain. He is suing for gross negligence. "I always worried about the safety of being in that refinery," he told the FT. "Every time you drove up to the gate and badged in, you worried; there is not a person who works in that place that does not worry."

130. BP's refinery safety record is the *worst* in the U.S. According to *The Houston Chronicle*:

### BP LEADS NATION IN REFINERY FATALITIES;

### Records show big gap between company and top U.S.-based peers

BP leads the U.S. refining industry in deaths over the last decade, with 22 fatalities since 1995 – more than a quarter of those killed in refineries nationwide, a *Houston Chronicle* analysis shows.

The company's total includes 15 contractors who died in the March 23 Texas City accident, as well as those who died in seven other fatal accidents, including one just last week in Washington state.

More than 10 times as many people have died in BP refineries as in those owned by Exxon Mobil Corp., considered the company's major U.S.-based peer.

\*     \*     \*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY      76 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-4    Filed 10/24/06    Page 6 of 40

*But in the weeks prior to the Texas City blast, the oil giant's dismal record landed BP on an internal Occupational Safety & Health Administration watch list of companies for being "indifferent" to its legal obligations to protect employee safety because of a fatal explosion in Texas City in September 2004 that killed two pipefitters and injured a third.*

OSHA accused BP of a "willful" violation of its rules that led to the accident.

OSHA's Enhanced Enforcement program *"zeroes in on employers with the gravest violations who have failed to take their safety and health responsibilities seriously,"* Jonathan Snare, acting assistant secretary of labor for Occupational Safety and Health, said in a recent speech.

*BP is the only major oil company on that list,* said John Miles, OSHA's regional director.

\*    \*    \*

**Signs of trouble**

Under the program, OSHA inspectors were to conduct follow-up inspections at BP's Texas City refinery, and also look for potential systemic problems at BP facilities in other states.

But before that happened, the Texas City refinery again exploded on March 23, 2005. It killed 15 contractors and injured more than 100 other people.

"We had not been back out there because we had just finished issuing the (previous citation) three weeks before," Miles said. "But they would have been under much more scrutiny."

*The fact that Texas City has had repeated fatalities and repeated fines is a sign of potential trouble within BP, said Charles Jeffress, a former director of OSHA.*

"It's their biggest refinery and you'd think this would get some attention, so if their flagship's not getting attention, well, shame on them," he said.

\*    \*    \*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY       77 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 7 of 40

The Texas City explosion was the seventh time a fatal accident had been reported this decade at a BP-owned facility – and the third fatal accident in Texas City.

## Leading in fatalities

*No other U.S. refining company reported as many death during the decade, according to a Chronicle analysis of 80 deaths described in newspaper reports, lawsuits, interviews with major oil companies, and government an industry statistics.*

Among big oil companies, only Shell and its Houston-based refining companies came close to BP's death toll. Shell Oil Products, predecessor Equilon Enterprises and sister company Motiva Enterprises together recorded 11 deaths – *half the BP total*. The last fatality was in 2001.

*       *       *

Miles, the OSHA regional administrator, called the unit that blew up in Texas City "antiquated equipment that is no longer used."

## Fair Trade, Price-Fixing/Manipulation

131.   Propane is the fourth most important source of fuel in the U.S. and residential/commercial demand for propane constitutes approximately 43% of U.S. domestic propane demand. Because the majority of this usage is for heating, the demand from this sector is highly seasonal. Much of this heating fuel is consumed in the U.S. Northeast and Midwest. The majority of households that use propane for heating rely on it for their sole source of heat. Propane is most commonly used to provide energy in areas not serviced by natural gas distribution systems, so it is commonly used in rural regions. Because propane is a heating fuel, demand from the residential and commercial markets tends to be inelastic, or price insensitive. *When prices for propane increase quickly, consumers of propane in the residential/commercial sector are generally unable to switch to other fuel sources for heating and, therefore, must either pay the price offered by propane merchants, or freeze.*

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                                       78 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 8 of 40

132.    BP's BP Products North America trading subsidiary artificially forced up propane prices during the peak 2003 and 2004 winter heating seasons by buying up huge propane stocks only to withhold them from the market. In early 7/06, a former BP trader, Dennis Abbott ("Abbott"), pleaded guilty to manipulating the propane market and some very damning tape recordings of Abbott and other BP traders engaging in the scheme surfaced. The CFTC, which regulates the propane-trading market, has now brought charges against BP, saying that BP's traders were manipulating propane prices. According to the government, Abbott and the other BP executives and traders were enriched for their misconduct through *"bonuses and other remuneration from BP"* and *"the purpose of the conspiracy was to enrich BP by inflating the price of propane . . . and then selling it at the inflated prices."*

133.    The CFTC alleges that during 2/04, propane prices jumped more than 40% to about 90 cents a gallon, a price that "would not otherwise have been reached under normal pressures of supply and demand." BP managed to manipulate upward the price by buying stocks of propane until it controlled almost 90% of the domestic market. Ronnie Chappell, a BP spokesman, conceded that the Company's own internal investigation confirmed that several BP trading employees failed "to adhere to BP policies governing trading activities." The government also alleges that the market manipulation was carried out *"with the knowledge, advice and consent of senior management"* at BP. Abbott, who is presently cooperating in the U.S. government's investigation of BP, pled guilty to charges that he tried to "manipulate and corner the propane market."

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 9 of 40

134.    The CFTC filed its enforcement action against BP in the federal district court in Illinois on 6/26/06 charging the Company with running a sham trading scheme designed to "corner" the U.S. propane market, putting hundreds of thousands, if not millions, of U.S. consumers at risk. Outraged with the evidence of BP's callousness toward the plight of U.S. energy consumers, the CFTC is now seeking permanent injunctive relief, disgorgement, restitution, and payment of civil monetary penalties against BP. The CFTC's 6/26/06 press release explained the civil charges BP is facing in detail, stating in relevant part:

> **U.S. Commodity Futures Trading Commission Charges BP Products North America, Inc. with Cornering the Propane Market and Manipulating the Price of Propane**
>
> **Complaint Alleges that BP's Actions Resulted in Higher Prices for Residential and Commercial Consumers of Propane**
>
> . . . The U.S. Commodity Futures Trading Commission (CFTC) announced today the filing of a civil enforcement action in the United States District Court for the Northern District of Illinois against BP Products North America, Inc. (BP), a wholly owned subsidiary of BP plc, alleging that *BP manipulated the price of February 2004 TET physical propane by, among other things, cornering the market for February 2004 TET physical propane*. The CFTC also charges BP with attempting to manipulate the price of April 2003 TET physical propane by *attempting to corner the April 2003 TET physical propane market*.
>
> The CFTC's complaint alleges that:
>
> *With the knowledge, advice, and consent of senior management*, BP employees developed and executed a speculative trading strategy in which BP cornered the February 2004 TET physical propane market;
>
> *        *        *
>
> By cornering the TET propane market, BP employees sought to generate a profit for BP of at least $20 million "with potential for upside from there"; and

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY
Pickett v. Madingley, et al., 3AN-06-_____Civil

BP's scheme to corner the market caused the price of TET propane to become artificially high.

*"Cornering a commodity market is more than a threat to market integrity. It is an illegal activity that could have repercussions for commercial market participants as well as retail consumers around this country.* This case clearly illustrates that complex and covert trading patterns will not prevent us from aggressively pursuing and exposing those that violate the Commodity Exchange Act," said Gregory Mocek, the CFTC's Director of Enforcement.

According to the complaint, in order to accomplish the corner during February 2004, BP employees purchased enormous quantities of propane to establish a dominant and controlling long position in February 2004 TET physical propane. The complaint further alleges that as a result of BP's strategy, as of February 17, 2004, BP's position in February 2004 TET physical propane exceeded the entire TEPPCO system propane inventory; and at the end of February 2004, BP owned over 88% of all TET propane.

Because BP possessed a dominant and controlling position in February 2004 TET propane, the complaint alleges, BP was able to dictate prices at which BP would sell the February 2004 TET propane to the shorts on at least February 27, 2004. According to the complaint, BP's actions caused the price of February 2004 TET propane to increase to over 90 cents per gallon on February 27, 2004—a price that would not otherwise have been reached under the normal pressures of supply and demand. As alleged in the complaint, during the winter months, including February, TET propane is purchased by retail consumers, typically those in more rural regions, to heat their homes.

The CFTC complaint further alleges that February 2004 was not the first time that BP engaged in an effort to corner the TET physical propane market. BP, by and through its employees, attempted to manipulate the price of April 2003 TET physical propane through a similar strategy of taking a dominant and controlling long position, the complaint alleges. The complaint also alleges that a BP employee described the April 2003 TET propane trading strategy as a "trial run" of the February 2004 TET strategy to corner the propane market.

135.    That same day the DOJ issued a release announcing Abbott's guilty plea:

**Former BP North America Trader Pleads Guilty to Conspiracy
to Manipulate and Corner the Propane Market**

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    81 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-4    Filed 10/24/06    Page 11 of 40

. . . Dennis N. Abbott, a former trader at a U.S. subsidiary of British Petroleum, has pleaded guilty to conspiring to manipulate and corner the propane market in the winter of 2004, Assistant Attorney General Alice S. Fisher of the Criminal Division announced today.

Abbott, 34, of Houston, entered his plea to a conspiracy charge today in U.S. District Court for the District of Columbia, before Judge James Robertson. *Under the terms of a plea agreement, Abbott faces up to five years in prison, a fine of $250,000, and supervised release following any incarceration. Abbott has agreed to cooperate with law enforcement officials in an ongoing investigation.*

Abbott admitted in his plea agreement and an accompanying factual statement that from Feb. 5, 2004 through July 28, 2004, he and other employees of a British Petroleum subsidiary, BP Products North America (BP), agreed to manipulate the February 2004 propane market for TET propane. Abbott admitted that prior to taking actions in furtherance of the scheme, he participated in a conversation with a co-conspirator in which they agreed that the market corner would permit BP not only to profit from the manipulation, but if successful, they would know BP could "control the market at will."

Abbott admitted that he and his conspirators carried out the strategy by using BP's market power and financial resources to buy large quantities of February 2004 TET propane to become the dominant long-holder of TET propane. The conspirators intended that their purchasing strategy would corner the market by reducing the supply of February 2004 TET propane, permitting them to sell propane at an artificially inflated price. If the plan was successful, BP would receive excessive profits derived through artificial manipulation of the market. By the end of February 2004, the conspirators controlled approximately 90 percent of TET propane supplies in the United States. Abbott admitted that the conspirators then sold TET propane at the end of February at an artificially inflated price and caused other market participants to pay a higher price than would have been available but for the market manipulation. *The purpose of the conspiracy was to enrich BP by inflating the price of propane in February 2004 and then selling it at the inflated prices, and to enrich the conspirators through bonuses and other remuneration from BP.*

Abbott admitted that he understood that the scheme was approved by senior executives at BP, and that steps were taken to avoid detection by market participants and others. For example, the co-conspirators were directed to

avoid using any language such as "squeeze," "leverage," and "corner," when describing the trading strategy in emails and telephone conversations.

136.    Because the government has obtained compelling evidence from the tapes, defendants will have a hard time defending and preventing BP from suffering the same fate as its now convicted trader, Abbott. On 2/5/04, one of the initial planning stages of BP's manipulative scheme was captured in a taped conversation. In this recorded conversation, one of BP's traders called Abbott to discuss obtaining management approval for the execution of their propane trading strategy, agreeing to "corner" the 2/04 propane market by taking steps to ensure they could "control the market at will" and thereby profit from future market manipulations. In the recording, these BP traders describe the benefits of executing the 2/04 propane "corner" as follows:

> Radley:    Two things I thought of. One, in terms of whether we should do this or not, in terms of talking to Jim [Summers], what we stand to gain, is not just we'd make money out of it, *but we would know from thereafter that we can control the market at will.* If we never break the threshold, we'll never know what the answer is, you know what I mean?

> Abbott:    Yeah, if you go for it, you'll know okay, wait a minute this market is way too big and we could never ever do this.

Their conversation then continued:

> Radley:    The second point is, that I would imagine that *the minimum operating level at the end of Feb. is higher than it is at the end of March or April* because I think the wholesalers have to hold barrels.

> Abbott:    have to have something on hand, in order to pump the first day. That's right.

| Radley: | So I think the minimum level might be a little higher than we're assuming based on what we experienced in April. *When we squeezed the April May.* |
|---|---|
| Abbott: | *Right, which was one of the reasons why it was harder to own all that April.* That's why we had to take on a little bit more than we thought we had to take on, in April. And that's why I think that 2 mm, 2.1 mm bbls as that min in Feb., I think that's real, man, I think that is, *that's the bottom at TET.* |

The remark "When we squeezed the April May," refers to BP's earlier attempted manipulation of the 4/03 propane price through an attempted corner of the market. In fact, more tapes were uncovered showing the 2004 squeeze had been perfected by an earlier squeeze in 2003. Going into the month of 4/03, BP had established a significant long position in 4/03 propane. On 4/2/03, in a taped conversation, three BP traders had the following conversation:

| Abbott: | How does it feel taking on the whole market, man? |
|---|---|
| Claborn: | Whew. It's pretty big man. |
| Abbott: | Dude, you're the entire [expletive deleted] propane market. |

*     *     *

| Radley: | *Don't worry about it, it's the first two days of the month. Plenty of lead time for people to think that barrels will emerge and take a short position.* |
|---|---|

*     *     *

| Abbott: | No, I mean, it's cool, 100% of the open interest in propane probably, and, uh 3% of the open interest in nat gas. . . . I dig it, it just, sometimes its hard, it just feels hard to take on the whole market sometimes . . . . |
|---|---|

*     *     *

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          84 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 14 of 40

| Radley: | Here's my one fear, and its a significant fear. Everybody waits until the last [expletive deleted] day to cover, and then we get wound up in a [expletive deleted] bunch of legal disputes. That's my fear. |
|---|---|
| Abbott: | Yeah. |
| Radley: | That's my fear. People don't cover, don't cover, then the last day they either default or come to us to get them out of it and then we have to try and basically set a price that seems fair . . . . |

137.    Despite their statements that they were "the entire propane market" and "100% of the open interest in propane," on 4/2/03, BP employees, acting pursuant to a BP trading supervisor's instructions, continued to purchase 4/03 propane in significant quantities throughout the month of 4/03.  BP employees, acting pursuant to the supervisors' instructions, continued to purchase 4/03 propane throughout the month in an effort to corner the 4/03 propane market, knowing that once BP cornered the 4/03 propane market, BP could force those who were short 4/03 propane to buy 4/03 propane from BP at high prices dictated by BP.  That significant increase in cost, in turn, would be passed onto the U.S.'s neediest energy consumers.

138.    In late 8/06, the DOJ sent subpoenas to BP investigating new claims of possible manipulation of the global over-the-counter crude oil market in 2003 and in 2004. The DOJ's probe is focused, in part, on whether BP used information about its pipelines and oil storage facilities at Cushing, Oklahoma to influence crude-oil price benchmarks.  In a separate criminal probe, investigators are examining whether BP manipulated gasoline prices on a single day's trading on the New York Mercantile Exchange in 2002.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                          85 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 15 of 40

139.     On 9/6/06, a civil class action suit was filed by Richard Hershey ("Hersey") in federal court in Manhattan alleging that BP used its position as a large supplier of oil and gas to influence the price of light, sweet crude oil futures on the New York Mercantile Exchange. Hersey's complaint mirrors the new allegations being probed by the CFTC. The lawsuit, which is seeking class-action status, alleges that BP used its dominant ownership of crude oil pipeline connections into and out of Cushing, Oklahoma, and its ownership of crude oil storage facilities there to control the amount of oil available to other market participants for delivery at Cushing, a key oil-delivery point. As a result, light sweet crude oil futures contracts were manipulated to "artificial levels" in 2003 and in 2004, the lawsuit claims.

140.     BP's trading desk, which during fiscal 2005 accounted for 13% of the Company's $22 billion in profits, has a reputation for aggressive tactics and BP has faced repeated inquiries and enforcement actions over its aggressive trading practices in the past. In 9/03, BP was fined $2.5 million by the New York Mercantile Exchange – *then a "record" fine – to resolve oil trading violations in 2001 and 2002. Allegations included wash trading, violations of rules governing the responsibility of exchange members for the actions of their employees, violations of rules governing hedging transactions, as well as "conduct substantially detrimental" to the exchange's interests.* The settlement included fines of $250,000 for each of the 10 allegations, the maximum fine allowable at the time of the settlement's negotiation. The total settlement was the largest ever agreed to by the New York Mercantile Exchange. Ronnie Chappell, BP's London spokesman, was quick to state that BP *did not* intend to take any disciplinary action against the Chicago traders involved in the allegations. BP also agreed that year to pay $3 million as part of a settlement of claims

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    86 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 16 of 40

that it had profited from false trades in the power market during the California energy crisis of 2000 and 2001. Five years earlier BP was fined a record £125,000 by the international petroleum exchange for fraudulent trades in Brent crude futures. By causing BP to violate the U.S. consumer protection and fair trade laws, defendants have exposed BP to criminal liability and tens of millions of dollars in potential fines, penalties, forfeitures and civil damages.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

141. Plaintiffs hereby incorporate ¶¶1-140 above.

142. Plaintiffs bring this action derivatively in the right and for the benefit of BP to redress injuries suffered and to be suffered by BP as a direct result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by the corporate and the individual defendants. BP is named as a nominal party solely in a derivative capacity.

143. Plaintiffs will adequately and fairly represent the interests of BP and its shareholders in enforcing and prosecuting its rights.

144. In bringing this action, plaintiffs have satisfied all statutory procedural requirements of Alaska law. First, plaintiffs have standing to bring this action as shareholders and/or beneficial owners of BP P.l.c. Second, plaintiffs will fairly and adequately represent the interests of the Company in enforcing the rights of the Company, as detailed herein. Third, this action is not being used by plaintiffs to gain any personal advantage; nor do plaintiffs maintain any person agenda other than seeking to correct the wrong that has been done to the Company. To this end, plaintiffs have taken steps to file this

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY
Pickett v. Madingley, et al., 3AN-06-_____Civil

action and have retained counsel experienced in derivative litigation and corporate governance actions. To the extent court permission is required to continue this action, such permission is hereby sought.

145. The BP P.l.c. Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, as detailed herein, and thus, pursuant to Alaska Stat.§10.06.435 and otherwise, plaintiffs' demand upon the Company to take the action requested herein is excused. For the following reasons and those detailed elsewhere in this Complaint, BP P.l.c.'s Board and its management are also antagonistic to this lawsuit and thus, plaintiffs have not made a pre-filing demand on the BP P.l.c. Board to initiate this action:

(a) The members of BP P.l.c.'s Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b) The members of BP P.l.c.'s Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Defendants Browne, Allen, Conn, Grote, Hayward, and Manzoni are so-called "inside directors" and are

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    88 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 18 of 40

executives of BP P.l.c. Six of BP P.l.c.'s 18 directors, or one-third, are current executives of the Company.

(c)     The inside directors were well compensated for their services during the relevant period. The inside directors are each eligible to receive significant bonuses as part of their compensation equal to 120%-150+% of their salary. The Remuneration Committee and Browne determine these bonuses based on the recipient having reached a number of targets, 50% of which are financial and operational metrics such as earnings before interest, tax, depreciation and amortization ("EBITDA") and return on average capital employed ("ROCE"); 30% of which are based on reaching annual strategic milestones taken from the group five-year business plan, including business development; and only 20% of which are based on subjective evaluations. Other objective considerations may override the 20% subjective evaluation factor, such as competitor results, analysts' reports and the view from the chairmen of other BP Board committees. As such, despite defendants' failure to oversee and manage the Company's operations, its repeated violations of law and resulting payment of excessive fines and penalties, and criminal conviction here in the U.S., the directors and officers were rewarded handsomely throughout the relevant period. Set forth below are tables showing the compensation to the individual defendants during 2000-2005:

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2000-2005 |
|---|---|---|---|---|---|---|---|
| **Chairman** Sutherland | $244,000 | $403,000 | $503,000 | $636,000 | $714,000 | $910,000 | $3,410,000 |
| **Dep.Chairman** Prosser | $121,000 | $122,000 | $147,000 | $187,000 | $201,000 | $246,000 | $1,024,000 |

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY
Pickett v. Madingley, et al., 3AN-06-_____Civil

**Directors**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Bryan | $88,000 | $82,000 | $120,000 | $155,000 | $183,000 | $200,000 | $828,000 |
| Burgmans | | | | | $97,000 | $164,000 | $261,000 |
| Davis | $88,000 | $82,000 | $120,000 | $147,000 | $192,000 | $200,000 | $829,000 |
| Flint | | | | | | $164,000 | $164,000 |
| Julius | | $6,000 | $95,000 | $130,000 | $137,000 | $195,000 | $563,000 |
| McKillop | | | | | $70,000 | $164,000 | $234,000 |
| Knight | $83,000 | $78,000 | $95,000 | $155,000 | $165,000 | $198,780 | $774,780 |
| Maijers | $65,000 | $78,000 | $95,000 | $130,000 | | | $368,000 |
| Massey | $83,000 | $94,000 | $135,000 | $179,000 | $210,000 | $237,000 | $938,000 |
| Miles | $69,000 | $78,000 | $95,900 | $131,000 | $137,000 | $164,000 | $674,900 |
| Nicholson | $99,000 | $111,800 | $140,000 | $187,600 | $201,600 | $247,280 | $987,280 |
| M. Wilson | $88,000 | $86,000 | $116,000 | $155,000 | $174,000 | $191,000 | $810,000 |

| Defendant | Year | Salary | Bonus | Salary + Bonus | 2000-2005 |
|---|---|---|---|---|---|
| **Browne** | 2000 | $1,231,000 | $1,396,000 | $2,627,000 | |
| Group CEO & Exec. Dir. | 2001 | $1,728,000 | $2,566,000 | $4,294,000 | |
| | 2002 | $1,926,000 | $2,543,000 | $4,469,000 | |
| | 2003 | $2,145,080 | $3,067,660 | $5,212,740 | |
| | 2004 | $2,529,060 | $4,172,400 | $6,701,460 | |
| | 2005 | $2,640,820 | $3,185,000 | $5,825,820 | $29,130,020 |
| **Buchanan** | 2000 | $680,000 | $771,000 | $1,451,000 | |
| CFO & Exec. Dir. | 2001 | $691,000 | $933,000 | $1,624,000 | |
| | 2002 | $715,000 | $787,000 | $1,502,000 | $4,577,000 |
| **Chase** | 2000 | $770,000 | $873,000 | $1,643,000 | |
| Dep. Grp. CEO | 2001 | $850,000 | $1,147,000 | $1,997,000 | |
| & Exec. Dir. | 2002 | $960,000 | $1,152,000 | $2,112,000 | |
| | 2003 | $376,530 | $480,850 | $857,380 | $6,609,380 |
| **Ford** | 2000 | $620,000 | $703,003 | $1,323,003 | |
| CEO Refin. & Mrktg. | 2001 | $720,000 | $972,000 | $1,692,000 | |
| & Exec. Dir. | 2002 | $180,000 | $180,000 | $360,000 | $3,375,003 |
| **Gibson-Smith** | 2000 | $619,000 | $702,000 | $1,321,000 | |
| Exec. Dir. | 2001 | $497,000 | $773,000 | $1,270,000 | $2,591,000 |
| **Grote** | 2000 | $225,000 | $255,000 | $480,000 | |
| CFO & Exec. Dir. | 2001 | $665,000 | $898,000 | $1,563,000 | |
| | 2002 | $713,000 | $856,000 | $1,569,000 | |
| | 2003 | $770,000 | $1,001,000 | $1,771,000 | |
| | 2004 | $841,000 | $1,262,000 | $2,103,000 | |
| | 2005 | $923,000 | $1,100,000 | $2,023,000 | $9,509,000 |

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    90 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 20 of 40

| | | | | |
|---|---|---|---|---|
| **Olver**<br>Dep. Grp. CEO & Exec.<br>Dir. | 2000 | $649,000 | $736,000 | $1,385,000 | |
| | 2001 | $708,000 | $956,000 | $1,664,000 | |
| | 2002 | $795,000 | $954,000 | $1,749,000 | |
| | 2003 | $929,100 | $1,207,830 | $2,136,930 | |
| | 2004 | $534,360 | $801,540 | $1,335,900 | $8,270,830 |
| **Allen**<br>Chief of Staff & Exec. Dir. | 2003 | $598,210 | $748,170 | $1,346,380 | |
| | 2004 | $750,300 | $1,125,450 | $1,875,750 | |
| | 2005 | $784,420 | $873,600 | $1,658,020 | $4,880,150 |
| **Hayward**<br>CEO E&P and Exec. Dir. | 2003 | $598,210 | $748,170 | $1,346,380 | |
| | 2004 | $750,300 | $1,125,450 | $1,875,750 | |
| | 2005 | $784,420 | $837,200 | $1,621,620 | $4,843,750 |
| **Manzoni**<br>CEO Refin. & Mrktg.<br>& Exec. Dir. | 2003 | $598,210 | $777,510 | $1,375,720 | |
| | 2004 | $750,300 | $1,125,450 | $1,875,750 | |
| | 2005 | $784,420 | $800,800 | $1,585,220 | $4,836,690 |
| **Conn**<br>CEO Strategic Resources<br>& Exec. Dir. | 2004 | $366,000 | $549,000 | $915,000 | |
| | 2005 | $766,220 | $819,000 | $1,585,220 | $2,500,220 |

(d)     The members of BP's Remuneration Committee determine the terms of engagement and remuneration of the executive directors and "monitor" the policies applied by the group chief executives in remunerating other senior executives. The members of the Remuneration Committee during FY 2005 were Prosser, Bryan, Davis, Julius, McKillop and Massey. The committee consisted of Prosser, Davis, Julius and McKillop during FY 2004. The committee consisted of defendants Nicholson (chairman), Julius (chairman elect), Davis, Knight, Prosser, Bryan, and McKillop during FY 2003. The committee consisted of defendants Nicholson (chairman), Davis, Julius, Knight and Prosser during FY 2002. By virtue of the fact each member of the Remuneration Committee was charged with ensuring that BP's compensation principles preserved the Company's assets and promoted long-term shareholder value and the compensation principles actually applied achieved the contrary, defendants Prosser, Bryan, Davis, Julius, McKillop and Massey are personally implicated by

the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly consider a pre-suit demand of the allegations contained herein.

(e)     Moreover, defendant Browne was "consulted on matters relating to [compensation of] the other executive directors who report to him and on matters relating to the performance of the company." By virtue of the fact that Browne decides the compensation of defendants Allen, Conn, Grote, Hayward, and Manzoni, he effectively controls them and they could not comply with the fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein against Browne or the other members of the BP P.l.c. Board.

(f)     The members of BP's Audit Committee were charged with (i) reviewing all annual and quarterly financial reports, including significant accounting policies, estimates and judgments, and overseeing the group's internal audit processes; (ii) reviewing the group's accounting and reporting treatment of environmental and decommissioning provisions, tax exposures, pension assumptions and the status of current litigation and "gain[ing] assurance that such liabilities and contingencies [are] appropriately reflected in the financial results"; (iii) overseeing the groups' risk management and internal control functions; (iv) ensuring compliance with applicable provisions of the Sarbanes-Oxley Act of 2002, including evaluating internal controls as required by rules pursuant to Section 404 of the Act; (v) reviewing all whistle-blower reports raised through the employee concerns programme (OpenTalk); and (vi) overseeing auditor independence and rotation. The members of the Audit committee were defendants Prosser (chairman), Bryan, Davis, Miles,

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    92 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 22 of 40

Flint, and M. Wilson during FY 2005; Prosser (chairman), Bryan, Davis, Miles, and M. Wilson during FY 2004; Prosser (chairman), Bryan and Davis during FY 2003; and Prosser (chairman), Bryan and Davis during FY 2002. By virtue of the fact that each member of the Audit Committee was charged with ensuring that BP's accounting and reporting practices ensured that all potential liability was accurately calculated and reported to the Company's investors and its was not, defendants Prosser, Bryan, Davis, and Flint are personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly consider a pre-suit demand of the allegations contained here.

(g)    The members of the BP Board's Ethics and Environment Assurance Committee were charged with (i) monitoring all matters relating to the "executive management's processes to address environmental, health and safety, security and ethical behavior issues," including monitoring "the observance of the executive limitations relating to non-financial risks to the group"; (ii) receiving and review reports "from executive management on current developments in business and functional areas giving rise to ongoing and emergent non-financial risks to the Group's activities," including oversight of the group's pipeline projects; (iii) reviewing all potential and actual environmental liabilities; (iv) reviewing the group's health, safety and environmental performance, including "[g]reenhouse gas and other emissions, spills and containment practices and safety at work issues, both group-wide and in specific businesses and locations"; (v) reviewing employee health issues; (vii) reviewing ethical behavior, including reviewing results of the "annual ethics certification process and OpenTalk (BP's employee concerns reporting programme),

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                93 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 23 of 40

as well as other conduct and compliance issues"; and (vii) reviewing the group's "capacity and capability to respond to catastrophic events and to maintain its business activities." The members of the committee during the relevant period were defendants Massey (chairman), McKillop, and Burgmans during FY 2005; Massey (chairman), Burgmans, Miles and M. Wilson during FY 2004; Massey (chairman), Burgmans, Maljers, Miles, and M. Wilson during FY 2003; and Massey (chairman), Maljers, Miles and M. Wilson during FY 2002. By virtue of the fact each member of the Ethics and Environment Assurance Committee was charged with overseeing the Company's environmental law compliance, ethics and risk mitigation, among other things, defendants Massey, McKillop and Burgmans are personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly consider a pre-suit demand of the allegations contained here.

(h)     The members of the BP Board's Chairman's Committee were charged with overseeing "broad issues of governance, including the performance of the chairman and the group chief executive, succession planning, the organization of the group and any matters referred to it for an opinion from another board committee." The members of the committee during the relevant period were defendants Sutherland (chairman), Prosser, Bryan, Burgmans, Davis, Flint, Julius, McKillop and Massey during FY 2005; Sutherland (chairman), Prosser, Bryan, Burgmans, Davis, Julius, McKillop, Massey, Miles and M. Wilson during FY 2004; Sutherland (chairman), Prosser, Bryan, Burgmans, Davis, Flint, Julius, Knight, McKillop, Massey, Miles, Nicholson and M. Wilson during FY 2003; and Sutherland (chairman), Prosser, Bryan, Burgmans, Davis, Julius, Knight, Maljers, Massey,

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                              94 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB    Document 5-4    Filed 10/24/06    Page 24 of 40

Miles, Nicholson and M. Wilson during FY 2002. By virtue of the fact each member of the Chairman's Committee was charged with overseeing the Company's governance and the performance of the group's chiefs, each outside defendant is personally implicated by the allegations contained herein and they would have been unable to comply with their fiduciary duties to disinterestedly consider a pre-suit demand of the allegations contained here.

(i) BP P.l.c.'s so-called "outside directors" are also handsomely rewarded for their service on BP P.l.c.'s Board and their willingness to accommodate the inside directors. Specifically, for instance, each outside director currently receives a stipend of £75,000 (increased from £65,000 during FY 2004), and a "transatlantic attendance allowance" fee of £5,000 each time they undertake transatlantic or intercontinental travel for the purpose of attending a board meeting or board committee meeting. The Chairman receives an annual stipend of £500,000 (increased from £390,000 during FY 2004). The Deputy Chairman receives an annual stipend of £100,000 (increased from £85,000 during FY 2004) and transatlantic and committee chairmanship fees (the Deputy Chairman is the chairman of the Audit Committee). Board members get other *valuable professional perquisites* from their positions as well. While the Board describes these members as "Non-Executive" and characterizes them as "independent," their remuneration, which converts to a value of approximately $142,000 (plus stock options), renders them anything but. For instance, Chairman Sutherland's "day job" is serving as the non-executive chairman of Goldman Sachs International, for which he is paid no more than $75,000 plus interests in

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          95 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 25 of 40

restricted shares.[2] That, combined with Sutherland's stipend for serving as a non-executive director at the Royal Bank of Scotland Group cannot compete with the £500,000 Chairman's fee he gets from BP and the BP pay makes up a considerably larger component of his annual income. Similarly, defendant Bryan receives $75,000 for his service as a non-executive director of Goldman Sachs, an annual stipend for serving as a director of GM, significantly less than the $142,000+ he receives from BP plus transatlantic fees of an estimated $9,400 for each board meeting attended in London, again constituting a significant portion of his annual income. Defendant Davis serves as the chancellor of the University System of Georgia, where he receives an annual compensation package valued at approximately $540,000 (including base salary, a housing allowance, a car and reimbursement for club memberships and other entertainment expenses), and defendant Massey serves as President of Morehouse College and is estimated to receive a comparable compensation package. Again, the $142,000+ received from BP is a significant portion of these men's annual incomes, rendering each of them dependent on BP and controlled by its executives who control their continued service on the BP Board.

(j)     Members of the BP P.l.c. Board as a whole have close alliances with and allegiances to the inside directors, who engaged in the primary illegal activities

---

[2]     Goldman Sachs' non-executive directors receive an annual stipend of $75,000 and an annual equity grant of 3,000 fully vested restricted stock units ("RSUS"), 1,500 fully vested RSUS and 6,000 fully vested options, or 12,000 fully vested options, at the non-executive director's election.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    96 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 26 of 40

complained of herein, and are dependent upon them for continuation of their lucrative and prestigious positions as directors:

>(i) ***Interlocking Directorships.*** Directors Browne and Bryan sit on the Goldman Sachs board of directors where defendant Sutherland serves as the non-executive chairman of Goldman Sachs International. Browne and Bryan both sit on the compensation committee that determines Sutherland's compensation and Sutherland oversees Browne's compensation as CEO of BP and Bryan's compensation as a director of BP. Accordingly, Browne is controlled by Bryan and Sutherland and Sutherland is controlled by Browne and Bryan and neither Browne nor Sutherland could independently consider a pre-suit demand to bring the allegations contained herein against the other.

>(ii) ***Interlocking Directorships.*** McKillop serves as the chairman of The Royal Bank of Scotland Group and Sutherland serves as a non-executive director at the Royal Bank of Scotland Group. McKillop sits on BP's remuneration committee and Sutherland sits on the remuneration committee of the Royal Bank of Scotland Group, permitting each to oversee the compensation of the other.

>(iii) In 1974, Bryan became president and a director of Sara Lee Corporation and served as chief executive officer from 1975 to 2000 and as chairman of the board from 1976 until his retirement in 2001. Prosser has served as a non-executive director of Sara Lee since 2004 at the request of Bryan with the acquiescence of the current Sara Lee Board.

>(iv) Bryan serves as a trustee of the University of Chicago where Massey served as vice president for research and professor of physics from 1984 to 1991.

Case 3:06-cv-00239-RRB    Document 5-4    Filed 10/24/06    Page 27 of 40

(v)     Julius is a non-executive director of Lloyds TSB Group PLC where McKillop and Prosser previously served as non-executive directors of Lloyds TSB Group PLC.

(vi)    Grote became commercial vice president for BP's Alaskan North Slope production activities, was appointed commercial general manager of BP exploration in 1989, and following the merger of BP and Amoco, in 1999 he was appointed executive vice president of BP's E&P. These posts afforded Grote a high degree of expertise in North Slope oil production issues, including pipeline corrosion problems.

(vii)   Hayward was appointed director of BP exploration in 1997, in 1999 following the merger of BP and Amoco, he became a group vice president and a member of the upstream executive committee, and was appointed an executive vice president in 2002, becoming chief operating officer for BP's E&P later that year. These posts afforded Hayward a high degree of expertise in North Slope oil production issues, including pipeline corrosion problems.

(viii)  Julius began her career in 1975 as a project economist with the World Bank in Washington, where her work included oil and gas projects in a number of Asian and African countries, and served as the chief economist at the Royal Dutch Shell Group in London from 1989 until 1993. These posts afforded Julius a high degree of expertise in oil production issues, including pipeline corrosion problems.

(ix)    Manzoni previously served as BP's Vice President Prudhoe Bay in Alaska, affording Manzoni a high degree of expertise in North Slope oil production issues, including pipeline corrosion problems at Prudhoe Bay.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    98 of 107
Pickett v. Madingley, et al., 3AN-06-_____ Civil

(x)     Massey received a number of letters from Hamel detailing the corrosion issues at Prudhoe Bay during the relevant period which he failed to cause the Board to act upon despite his heightened duties as a member of both the Chairman's and the Ethics and Environmental Assurance Committees.

(k)     BP's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of BP. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by BP P.l.c. against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of BP, there would be no directors' and officers' insurance protection and thus, this is a further reason why the Director Defendants will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(l)     In order to bring this action for breaching their fiduciary duties, the members of the BP P.l.c. Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                99 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 29 of 40

and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

### FIRST CAUSE OF ACTION

#### (Derivative Claim for Breach of Fiduciary Duties Against All Defendants)

146. Plaintiffs hereby incorporate ¶¶1-145.

147. Defendants are fiduciaries of BP and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently. This cause of action is asserted based upon the defendants' acts in violation of applicable law, which acts constitute a breach of fiduciary duty.

148. Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful conduct.

149. Defendants are responsible for the gross mismanagement of BP, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:

(a) They caused BP to violate applicable law, disregarding their duties as fiduciaries.

(b) They have caused BP to violate core worker safety and environmental laws and exposed the Company and its shareholders to criminal liability and unnecessary costs, fines, penalties and tort liability.

(c)     They exposed the Company and its shareholders to massive fines, penalties and compensatory damage awards for violations of U.S. and Alaska state environmental laws.

(d)     They subjected BP to adverse publicity and loss of goodwill, greatly increased its costs to raise capital, and impaired its earnings.

150.    The damage to BP's reputation, standing and business goodwill is epitomized by a 9/2/06 *Wall Street Journal* (on-line) article:

**BP Prepares to Move Beyond Browne**

**Before Passing the Reins, Chief Needs to Tighten Grip To Restore Stock's Premium**

> Lord Browne of Madingley is near the end of his time at the helm of BP PLC. During the past 11 years, he has certainly turned the former British government-owned oil company into a giant. Along the way, Lord Browne's reputation has grown with BP's girth. Shareholders, however, haven't correspondingly benefited from BP's global shopping spree.

> Regulatory investigations into possible market manipulation in the U.S. and accidents in Alaska and Texas have thrown the issue into sharp relief and reduced the premium traditionally accorded to BP's shares. BP says it is aware of the regulatory inquiries and "cooperating fully" with U.S. authorities.

> These issues have also put the company in the crosshairs of American legislators. The politicians are already worried about popular anger over rising gasoline prices at a time of record profits for Big Oil, and will grill senior BP executives, led by the president of its U.S. arm, about pipeline leaks in the coming week on Capitol Hill.

> Other major oil firms haven't suffered similar problems in the U.S. . . . .

151.    The harm to BP's reputation is further shown by the way U.S. lawmakers savaged it at a recent hearing, saying "BP" stands for "bloated profits," "broken pipelines" or "bad pipelines." As *CNN Money.com* reported:

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          101 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 31 of 40

**BP "fell short" on pipeline, execs admit**

**Malone calls failures "unacceptable," Former BP corrosion monitor pleads Fifth, as execs grilled over Prudhoe Bay.**

. . . BP's top U.S. executives told lawmakers Thursday that the company stumbled by failing to prevent a major Alaskan pipeline from becoming crippled by corrosion.

At the hearing, a former BP official responsible for monitoring pipeline corrosion invoked the Fifth Amendment in response to the panel's questions about the problems that led to the partial shutdown of the nation's largest oilfield.

"BP's operating failures are unacceptable," BP America Chairman Bob Malone told members of a House panel. "They have fallen short of what the American people expect of BP and they have fallen short of what we expect of ourselves."

\*       \*       \*

"I deeply regret this situation occurring on my watch," said Steve Marshall, president of BP exploration in Alaska . . . .

. . . He also said BP would increase "pigging" with a pipeline analysis device to try to prevent further problems and was investigating the source of corrosion that precipitated the spill.

Pigging is the process of running a mechanical device through a pipeline to clean it or to test for corrosion. Lawmakers said that BP relied too heavily on ultrasound analysis, which does not work on some of the more deeply buried pipelines.

Company executives expressed regret for the maintenance failures . . . .

**Fifth Amendment**

Richard Woollam, who used to head corrosion monitoring for BP at Prudhoe Bay, invoked his Fifth Amendment right against self-incrimination to avoid answering questions from lawmakers.

Marshall of BP said Woollam was pulled from a supervisory position and transferred out of Alaska after outside investigations determined there was

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                102 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 32 of 40

an "atmosphere of intimidation" in the corrosion monitoring department that was "suppressing safety concerns."

Marshall said Woollam is still employed by BP but that he is on paid leave. . . .

The hearing began with a browbeating from Rep. Joe Barton of Texas, chairman of the House Energy and Commerce Committee.

"*Years of neglecting to inspect the most important oil-gathering pipeline in this country is not acceptable*," the Republican told the hearing held by the committee's investigations and oversight panel.

If BP, "one of the world's most successful oil companies," is incapable of conducting basic maintenance on the walls of some of the country's most important oil pipelines, then regulators should "*let somebody else do it*," Barton said.

Rep. Jan Schakowsky, D-Ill., said it was "*truly beyond comprehension*" that a profitable company such as BP would fail to maintain the infrastructure that was the basis for its earnings, adopting a "*see-no-evil approach to Prudhoe Bay operations*."

*The company was also criticized for presenting itself, through advertising, as environmentally friendly while failing to prevent damaging oil spills.*

"*If the company spent as much on maintenance as it does on advertising and lobbying for tax cuts, none of us would have to be here today*," said Schakowsky.

Focusing on BP's slogan of "Beyond Petroleum," Rep. Ed Markey, D-Mass., said, "BP stands for a company with *bloated profits that failed to fix bad pipelines*."

152. As a result of defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws, BP has suffered considerable damage to and drastic diminution in the value of its assets.

153. All defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

154. Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

155. By reason of the foregoing, defendants have breached their fiduciary obligations to BP and its shareholders.

156. BP and its shareholders have been injured by reason of the defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company. Plaintiffs, as shareholders and representatives of BP, seek damages and other relief for the Company as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Derivative Claim for Waste of Corporate Assets
### Against All Defendants)

157. Plaintiffs hereby incorporate ¶¶1-145.

158. As a direct result of the wrongdoing alleged herein, defendants have unreasonably and unnecessarily caused BP to expend hundreds of millions of dollars of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

159. Additionally, as set forth above, defendants have awarded themselves excessively lucrative compensation which has no reasonable basis, but instead is designed

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                104 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 34 of 40

only to enrich themselves in spite of their abominable stewardship and the Company's dismal performance.

160.    As a direct and proximate result of these defendants' waste of corporate assets as alleged herein, BP has sustained damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing BP to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Articles and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    an amendment to the Company's Articles limiting the number of executive directors on the BP Board to two;

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                105 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

(ii)     a proposal to strengthen the BP Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    establishing an environmental and litigation exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

(iv)     a provision to permit the shareholders of BP to nominate at least three candidates for election to the BP Board;

(v)      appropriately test and then strengthen the internal audit and control functions;

(vi)     reform executive compensation;

(vii)    require full compliance with Sarbanes-Oxley; and

(viii)   permit shareholders to question all executive directors of BP at the Annual General Meeting and establish a more transparent process for receiving and evaluating shareholder proposals.

D.      Awarding punitive damages;

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY                    106 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 36 of 40

E.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

DATED:  October 2, 2006

FOSLER LAW GROUP, INC.
JAMES E. FOSLER
Alaska Bar No. 9711055

_____
JAMES E. FOSLER

737 West 5th Avenue, Suite 205
Anchorage, AK  99501
Telephone:  907/277-1557
907/277-1657 (fax)

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (*Pro Hac Vice* pending)
DARREN J. ROBBINS (*Pro Hac Vice* pending)
MARY K. BLASY (*Pro Hac Vice* pending)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

CUNEO GILBERT & LaDUCA
JONATHAN W. CUNEO
PAMELA GILBERT
507 C Street, NE
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Attorneys for Plaintiffs

S:\CptDraft\Derivative\Cpt BP Derv.doc

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY          107 of 107
Pickett v. Madingley, et al., 3AN-06-_____Civil

Case 3:06-cv-00239-RRB   Document 5-4   Filed 10/24/06   Page 37 of 40

# VERIFICATION

I, WILLIAM S. LERACH, hereby declare as follows:

I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated herein are true.

I make this Verification because plaintiffs are absent from the County of San Diego where I maintain my office.

Executed this 28th day of September, 2006, at San Diego, California.

_____
WILLIAM S. LERACH

# ATTACHMENT A

# BP Board 1998-2006

bp


Peter Sutherland
BP Non-Executive
Chairman


The Lord Browne
of Madingley
BP Group CEO
Executive Director


Ian Prosser
BP Deputy Chairman


Byron Grote
BP CFO
Executive Director


John Manzoni
BP Group Managing
Director & CEO of
Refining & Marketing


David Allen
BP Chief of Staff &
Executive Director


Tony Hayward
BP CEO of E&P and
Executive Director


Iain Conn
BP Group Executive Officer Strategic
Resources & Executive Director


Richard Woollam
Corrosion Engineer
BP Alaska


Robert Malone
Chairman and President
of BP America Inc.


Steve Marshall
President of BPX

Executive Director

Non-executive Director

William Costell – BP Non-Executive Director 7/2006 – Present

Douglas Flint – BP Non-Executive Director 1/2005 – Present

Tom McKillop – BP Non-Executive Director 7/2004 – Present

Antony Burgmans – BP Non-Executive Director 2/2004 – Present

Iain Conn – BP Group Executive Officer Strategic Resources and Executive Director 2004 – Present

Tony Hayward – BP CEO of E&P and Executive Director 2003 – Present

David Allen – BP Chief of Staff and Executive Director 2003 – Present

John Manzoni – BP Group Managing Director and CEO of Refining and Marketing 2002 – Present; BP Executive Director 2003 – Present

DeAnne Julius – BP Non-Executive Director 2001 – Present

Douglas Ford – BP CEO Refining & Marketing and Executive Director 2000 – 2002 (former Amoco Executive)

Byron Grote – BP CFO 2002 – Present; BP Executive Director 2000 – Present

Dick Olver – BP Deputy Group CEO 2003 – 7/2004; BP Executive Director 1998 – 7/2004

Ian Prosser – BP Deputy Chairman 1999 – Present; BP Non-Executive Director 1997 – 1999

John Buchanan – BP CFO and Executive Director 1996 – 11/2002

Floris Maljers – BP Non-Executive Director 1998 – 2004; Amoco Director 1994 – 1998

Michael Miles – BP Non-Executive Director 1994 – 2006

Michael Wilson – Non-Executive BP Director 1998 – 2/2006; Amoco Director 1993 – 1998

Rodney Chase – BP Deputy CEO and Executive Director 1992 – 2003

Erroll Davis – BP Non-Executive Director 1998 – Present; Amoco Director 1991 – 1998

The Lord Browne of Madingley – BP Group CEO 1995 – Present; Executive BP Director 1998 – Present

Peter Sutherland – Non-Executive Chairman BP 1997 – Present; Non-Executive BP Director 1995-1997 and 1990 – 1993

Robin Nicholson – BP Executive Director 1987 – 2005

Charles Knight – BP Executive Director 1987 – 2005

Walter Massey – Non-Executive BP Director 1998 – Present; Amoco Director 1983 – 1998 and 1983 – 1991

John Bryan – BP Non-Executive Director 1998 – Present; Amoco Director 1982 – 1998

| J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S |

1998 — 1999 — 2000 — 2001 — 2002 — 2003 — 2004 — 2005 — 2006

12/98 BP "pigs" some of its transit lines in Alaska for the last time prior to the March 2006 spill – others had not been "pigged" since 1990

1/3/00 BP's 5-year probation in Alaska commences

8/01 North Slope workers publicly complain that BP is under-funding its operations and is operating hazardously – BP denies the claims

15/02 A worker replacing a high-pressure line at Prudhoe Bay is killed when a plug blew out of the pipeline

3/03 A corroded pipe under a roadway crossing in Prudhoe Bay begins leaking and thousands of gallons of oil and 4,500 gallons of oily water leak onto the tundra – BP agrees to monitor the caribou crossings

1/05 South Coast Air Quality Management District files a second complaint against BP entities in California Rata Court alleging air quality law violations at the Carson refinery

4/06 The U.S. Pipeline and Hazardous Materials Safety Administration orders BP to inspect and "pig" all transit lines in Prudhoe Bay

7/06 A worker dies at BP's Texas City refinery after being pinned against a pipe

2002 The State of Alaska fines BP $300,000 and ordered it to install a leak-detection system in its Prudhoe Bay operations

3/1/03 South Coast Air Quality Management District files a complaint against BP entities in California Rata Court alleging air quality law violation at the Carson refinery

1/3/05 BP's 5 year probation in Alaska is completed

4/24/06 OSHA issues heat citations to BP's Ohio refinery and fines BP $2.4 million

9/7/06 BP receives two subpoenas from the Alaska Department of Environmental Conservation seeking a dossier worth of maintenance records

9/28/1999
• BP guilty plea; illegal dumping in Alaska
• Pays $15 M criminal fine
• Pays $6.5 M civil fine
• Ordered to make $15 M in environmental improvements
• Placed on 5-yr probation

2/2001
BP settles state suit & pays Cannot Dispute with the U.S. $171 M several states to avoid prosecution for violations of the Clean Air Act

2001 Coffman Engineering completes initial draft report denying BP's maintenance on its North Slope pipeline which is positively critical of BP's ineffective corrosion prevention protocols

3/02 A revised version of Coffman Engineering reports is issued following BP's stern criticisms of the initial report – much of the corrosion prevention criticism is removed

3/03 BP agrees to settle the South Coast Air Quality Mgt District suit for $22 M in cash, penalties & agrees to spend $20 M reducing refinery emissions

4/2004
A revised version of Coffman Engineering reports is issued following BP's stern criticisms

2/1/05
A $319,000 penalty levied at BP and is discovered in Prudhoe Bay

3/1/05
A $319,000 penalty is levied against Prudhoe Bay

8/06 Second leak discovered in BP's Prudhoe pipeline system causes the temporary shutdown of the entire North Slope